# INTERSTATE COMMERCE COMMISSION *v.* BAIRD.

APPEAL, FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE SOUTHERN DISTRICT OF NEW YORK.

No. 409.   Argued March 7, 8, 1904.—Decided April 4, 1904.

The object of construction is to ascertain the legislative intent, and, if possible, to effectuate the purposes of the lawmakers.

Although not in accord with its technical meaning, or its office when properly used, a frequent use of the proviso in Federal legislation is to introduce new matter extending, rather than limiting or explaining, that which has gone before.

Under the proviso in § 3 of the act of February 19, 1903, a direct appeal may be taken to this court from a judgment of the Circuit Court in a proceeding brought by the Interstate Commerce Commission, under the direction of the Attorney General, to obtain orders requiring the testimony of witnesses and the production of books and documents.

Relevancy of evidence does not depend upon the conclusiveness of the testimony offered, but upon its legitimate tendency to establish a controverted fact.

Where a company owned by a railroad purchases coal at the mines or breakers under a contract fixing the price to the vendor on the basis of a percentage of the average price received at tidewater in another State, it being claimed that this transaction was the means whereby the railroad gave preferential rates to the companies selling the coal, the Interstate Commerce Commission may, in a proceeding properly instituted, inquire into the manner in which the business is done, and compel, through the Circuit Court, the testimony of witnesses and the production of the contracts relating thereto.

Where coal companies who had organized a competing line to tidewater made contracts with railroad companies for the purchase of the collieries by the railroad companies, which resulted in the abandonment of the proposed competing line, the contracts are relevant evidence bearing upon the manner in which rates were fixed, and their production before the Commission in an investigation, properly commenced, as to the reasonableness of coal rates, should be ordered by the Circuit Court.

Compelling the giving of such testimony and the production of such contracts does not deprive the witnesses of any rights under the Fourth and Fifth Amendments to the Constitution of the United States.

THIS is an appeal from an order made in the Circuit Court of the United States for the Southern District of New York in the matter of the petition of the Interstate Commerce Commission for orders requiring the testimony of witnesses and the production of certain books, papers and documents. The petition recites that the Attorney General of the United States, at the request of the Interstate Commerce Commission, instructed the United States District Attorney for the Southern District of New York to present the petition and institute proper proceedings for the enforcement of the provisions of the acts to regulate interstate commerce as amended, and to invoke the aid of the court in requiring the attendance and testimony of witnesses and the production of books, papers and documents, pursuant to the provisions of said acts. The case

grows out of a complaint of William Randolph Hearst, filed on November 2, 1902, with the Interstate Commerce Commission, against the Philadelphia and Reading Railway Company, Lehigh Valley Railroad Company, Delaware, Lackawanna and Western Railroad, Central Railroad Company of New Jersey, New York, Susquehanna and Western Railroad Company, Erie Railroad Company, New York, Ontario and Western Railway Company, Delaware and Hudson Company, Pennsylvania Railroad Company and Baltimore and Ohio Railroad Company.

In the complaint it was charged: That the defendants are common carriers, engaged in the transportation of passengers and freight between points in different States of the United States, and are particularly engaged in the transportation of anthracite and bituminous coal mined in Pennsylvania, Maryland and West Virginia, and shipped as interstate traffic over said lines, and are carriers subject to the provision of the act of February 4, 1887, to regulate commerce, and the acts amendatory thereto; that the rates charged and exacted by the defendants for the transportation of anthracite coal in carloads from points in the anthracite coal region of Pennsylvania to New York city and New York harbor points and internal points of destination in the State of New York, to Boston and other points in the New England States, to Baltimore and other points in the State of Maryland, and to Washington, in the District of Columbia, are unreasonable and unjust, and subject consumers and producers of such coal, who are not common carriers or corporations owned and controlled by common carriers, to undue and unreasonable prejudice and disadvantage in favor of and to the undue and unreasonable preference and advantage of said defendants and companies under their control, in violation of sections 1 and 3 of the act to regulate commerce; that the rates charged and exacted by the defendants for the transportation of anthracite coal are relatively unreasonable and unjust, and unjustly discriminating against the interests of dealers and consumers of that com-

modity as compared with the rates contemporaneously charged by said defendants for transportation of bituminous coal for much longer distances and to the points of destination above mentioned, and also as compared with the defendants' rates and charges on other carload freight generally, all of which is a violation of §§ 1, 2 and 3 of the act to regulate commerce; that the defendant companies—Lehigh Valley Railroad Company, Central Railroad Company of New Jersey, Delaware, Lackawanna and Western Railroad Company, New York, Susquehanna and Western Railroad Company and the Philadelphia and Reading Railway Company—are, in the absence of agreement, natural competitors in the business of transporting anthracite coal from the coal fields of Pennsylvania to tide-water at New York, two of said defendants—the Lehigh Valley Railroad Company and the Central Railroad Company of New Jersey—being substantially parallel lines; that in 1896, 1897, 1898, 1899, 1900 and 1901 the six defendants last named, by an agreement and combination with one another, pooled and have during the year 1902 pooled freights and freight traffic in anthracite coal, so as to divide the same between their different lines in agreed proportions, in violation of § 5 of the act to regulate commerce. The prayer of the petition was that the defendants be required to make answer to the charges, and, after hearing, for an order or orders commanding the said defendants, and each of them, wholly to cease and desist from each and every of the alleged violations of the act to regulate commerce, and for such further order or orders and action by the commission as its duty under the act and the cause of petitioner and others similarly situated may require. Answers were filed by the railroad companies, taking issue with the allegations of the petition and denying violation of the law. In the course of the hearing certain witnesses refused to produce contracts and answer questions when required so to do by order of the commission, which refusal gave rise to the petition to the Circuit Court. The character of the testimony required by the order of the commission is sufficiently

set forth in the opinion hereinafter given. To the petition answers were filed too lengthy to abstract, and in substance setting forth the right of the defendants to refuse the production of the papers and documents and to decline to answer the questions because the same did not relate to any subject which the commission had the right to investigate and the contracts relate to the private business of persons not parties to the proceedings before the commission; that the witnesses are protected in their right to refuse to produce the contracts or answer the questions by the Fourth, Fifth and Tenth Amendments to the Constitution of the United States; that the contracts were not relevant to the subject matter of investigation before the commission. The Circuit Court placed its decision on the latter ground, and dismissed the petition of the Interstate Commerce Commission.

*Mr. William A. Day,* assistant to the Attorney General, and *Mr. John G. Carlisle* for appellant:

On the motion to dismiss. This appeal can be prosecuted.

Suits by the Interstate Commerce Commission, whether they are at law or in equity, are not prosecuted in the name of the United States, and therefore, while the act of February 11, 1903, specifically referred to suits brought to enforce the act, yet it could have no practical application to them; and in order to remedy this defect the act of February 19, 1903, was passed.

See also § 12 of the act to regulate commerce as amended March 2, 1889, and February 10, 1891. This is a proceeding of the same nature as that provided for in § 16 of the act to regulate commerce and in § 3 of the act of February 19, 1903. As to meaning of word "case" and the construction of this statute, see *Interstate Com. Com.* v. *Brimson,* 154 U. S. 447; *Rich* v. *Keyser,* 54 Pa. St. 86, 89; Endlich on Interp. 534; *Hunter* v. *Martin,* 1 Wheat. 304, 337. As to effect of proviso, see *Minis* v. *United States,* 15 Pet. 423; *Ches. & Pot. Tel. Co.* v. *Manning,* 186 U. S. 238, 242; *Austin* v. *United States,* 155 U. S. 417, 431; *Georgia Banking Co.* v. *Smith,* 128 U. S. 174,

181. The word "provided" is not always used to introduce a technical proviso but new legislation; for instances, see 17 Stat. 195; 18 Stat. 72; 18 Stat. 351; 18 Stat. 525; 31 Stat. 1023.

This case is also appealable under § 5 of the Court of Appeals act of 1891 as it involves the construction or application of the Constitution of the United States. *Cornell v. Green,* 163 U. S. 75, 78; *Filhiol v. Maurice,* 185 U. S. 108, 110; *Penn Mut. Life v. Austin,* 168 U. S. 685, 695; *Holder v. Aultman,* 169 U. S. 81, 88; *Loeb v. Columbia Township,* 179 U. S. 472, 479; Desty's Fed. Proc. notes under § 5 of the act of 1891. Cases on appellee's brief distinguished as they involved the construction of provisions of law materially different from § 5 of the act of 1891.

As to the merits, the commission has jurisdiction to hear this complaint even if complainant is not a shipper of coal himself. The act expressly so provides. The commission was making a general investigation under § 12 of the act and the Hearst complaint was simply the occasion of the investigation.

The test of relevancy in a proceeding before this commission is not the strict test applied to trials at common law. "Relating to" as used in the statute is a broader term even than "relevant to." The commission must in its examinations take a broad range if it is to fulfill the purposes of its creation. *Brimson's Case,* 154 U. S. 473; *Interstate &c. v. Cincinnati &c. Ry. Co.,* 167 U. S. 479, 506; *Tex. & Pac. Ry. v. Interstate &c.,* 162 U. S. 212, 233.

Even if the contracts relate to sale and not to transportation of coal, the carriers cannot object to their production, as they themselves have blended the two subjects so that an investigation of one involves the other. See for instance *Powell v. Pennsylvania,* 127 U. S. 678, 685. The contracts, however, are not for sales as they purport to be but for transportation. There is nothing in the contention that by being compelled to testify the constitutional rights of witnesses would be invaded. *Brown v. Walker,* 161 U. S. 608.

*Mr. John G. Johnson,* with whom *Mr. Francis I. Gowen* and *Mr. F. H. Janner* were on the brief, for appellees Thomas and Baird.

*Mr. Adelbert Moot,* with whom *Mr. George F. Brownell* was on the brief, for appellees Richardson and Sturges.

*Mr. Walter W. Ross* for appellees Truesdale, Chambers and Post.

*Mr. J. D. Campbell* submitted a brief for appellees Baer and Brown.

*Mr. Robert W. de Forest* and *Mr. Robert Thorne* submitted a brief for appellee Waterman:

This court has no jurisdiction. No constitutional question is involved as in the *Brimson Case,* 154 U. S. 447. This direct appeal is not authorized under § 5 of the act of March 3, 1891. No question of jurisdiction of the Circuit Court has been certified to this court. No construction or application of the Constitution can be said to have been involved in the judgment below, nor did the Circuit Court construe the Constitution, nor was it requested to construe it. *Cornell* v. *Green,* 163 U. S. 78; *Ansbro* v. *United States,* 159 U. S. 698; *Lampasas* v. *Bell,* 180 U. S. 276; *Muse* v. *Arlington Hotel Co.,* 168 U. S. 430; *Carey* v. *Houston & Texas Central,* 150 U. S. 170; *Defiance Water Co.* v. *Defiance,* 191 U. S. 184; *Arbuckle* v. *Blackburn,* 191 U. S. 405; *W. U. Tel. Co.* v. *Ann Arbor R. Co.,* 178 U. S. 276, 282.

The constitutional question must be the controlling question in the case. *Carter* v. *Roberts,* 177 U. S. 496, 500; *Casey* v. *Houston & Tex Cent.,* 150 U. S. 170, 181.

This case is not unlike the case of a "supervisory" order in bankruptcy proceedings, that is not a final order, *Wisall* v. *Campbell,* 93 U. S. 347; *Cauro* v. *Crane,* 94 U. S. 441; or an

order dissolving an injunction pending suit, *McCollum* v. *Eager*, 2 How. 61, 64; or the case of a discretionary order refusing to open a decree, *Brockett* v. *Brockett*, 2 How. 238, 240; or an order refusing to let one intervene as a party, *Ex parte Cutting*, 94 U. S. 14. It is a merely interlocutory order so no appeal will lie. *McGourkey* v. *Railway Co.*, 146 U. S. 536, 545; *Van Stone* v. *S. & B. Mfg. Co.*, 142 U. S. 128, 134. Nor is this a case. The party setting the proceedings in motion has no rights to assert. *Osborn* v. *Bank*, 9 Wheat. 819. An appeal does not lie unless the party appealing has an interest. *Bryant* v. *Thompson*, 128 N. Y. 426, 434; *Nat. Ex. Bk.* v. *Peters*, 146 U. S. 570.

If a statute does not authorize the appeal the United States cannot maintain an appeal in this court. *United States* v. *Railway*, 105 U. S. 624. Nor can an official succeed upon appeal when he is not legally aggrieved, even if other officials are aggrieved, who do not appeal. *Cherokee Co. Com.* v. *Wilson*, 109 U. S. 626. A party not legally affected by a decision cannot appeal; or trustees of bondholders, *F. L. & T. Co.* v. *Waterman*, 106 U. S. 269; or a receiver, *Close* v. *G. Cemetery*, 107 U. S. 474. An unaffected party generally cannot appeal. See *Brown* v. *Smart*, 145 U. S. 459, and cases there cited. The commission have and can have no legal "controversy" with the parties here, and by submitting the case to the commission for decision upon further evidence without instituting this proceeding Mr. Hearst has shown he has no "controversy" to bring here, so no "controversy" is brought before this court by the appeal and it must be dismissed. *Little* v. *Bowers*, 134 U. S. 547, 652, and cases cited p. 558.

This appeal is not authorized by the acts of February 11, 1903, or February 19, 1903. In construing these acts the court must determine whether Congress intended that in any proceeding under the direction of the Attorney General in the name of the commission an appeal would lie to this court. As to the principles of construction applicable to the Constitution and laws of United States, see *Ogden* v. *Saunders*, 12 Wheat. 213;

*Petri* v. *Commercial Bank,* 142 U. S. 650; *McKee* v. *United States,* 164 U. S. 293; *Smith* v. *Townsend,* 148 U. S. 494, and cases cited; *United States* v. *Union Pac. R. Co.,* 91 U. S. 72, 79; *Van Patten* v. *Chi. M. & St. P. R. Co.,* 81 Fed. Rep. 547; *Smythe* v. *Fiske,* 23 Wall. 374, 384. The intention of the law-maker is the law. *Lau Ow Bew* v. *United States,* 144 U. S. 47, 59.

The clause of section 3 of the act of February 19, is in the form of a proviso. The ordinary purpose of a proviso in a statute is to qualify or restrict the statute, or the particular section thereof to which it is attached. Sutherland on Stat-utory Construction, § 223; *Minis* v. *United States,* 15 Pet. 423; *Savings Bank* v. *United States,* 19 Wall. 227, 236. It is ordi-narily applicable only to such statute or section, and should be construed with reference thereto. *Lehigh* v. *Meyer,* 102 Pa. St. 479. It will not be deemed from doubtful words to be intended to enlarge or extend the act or provision on which it is engrafted. *In re Webb,* 24 How. Pr. 247, 249. The form used indicates that the clause is intended to apply only to § 3 to which it is attached.

The last amendment is confined to suits brought in the name of the United States. History of the legislation should be looked at to get its intent. *Am. Twine Co.* v. *Worth-ington,* 141 U. S. 468, 474; *Smythe* v. *Fiske,* 23 Wall. 374, 380; *Hawaii* v. *Mankichi,* 190 U. S. 197, 212.

The object of the act of March 3, 1891, was to relieve this court of just such work as this appeal involves. *McLish* v. *Roff,* 141 U. S. 665. The motion to dismiss should be granted. *Interstate &c.* v. *Atchison &c. Co.,* 149 U. S. 264.

On the merits. Hearst had no interest in the contracts and could not demand their production. Greenleaf, § 298. See *Haddock's Case,* 4 I. C. C. R. 322; *Brimson's Case,* 154 U. S. 478. The D. L. & W. road has the right to engage in buying, selling and mining of coal as well as its transportation. Laws of Pennsylvania, 1832, p. 316; 1849, p. 648; 1855, p. 110; 1869, p. 31.

As to the jurisdiction of the commission, see 1 Supp. U. S. Rev. Stat. 529; *Interstate &c.* v. *C. N. O. & C. Ry. Co.*, 167 U. S. 506.

The contracts were only for the purchase of coal, not for its transportation from one State to another.

A contract made between citizens of Pennsylvania providing that the owner will sell a part or all of the coal which he digs from his mines to the purchaser at a certain price under which it is delivered at the mines in that State is wholly a domestic transaction governed exclusively by the domestic law, if such law is not in conflict with the Constitution of the United States. The coal which is the subject of the contract is a part of the general mass of property of that State and subject to its jurisdiction.

The purchase of the coal at the mines was a domestic transaction and subject exclusively to the laws of Pennsylvania, and the commission exceeded its jurisdiction when it directed the witnesses, at the request of Hearst, to produce such contracts for his inspection, or when it directed the witnesses to produce papers showing the cost of such coal, or to answer questions as to the cost of producing coal or selling it.

When, however, the coal started on its "final movement for transportation" from Pennsylvania to New Jersey—or any other State—the rate charged for its transportation became a proper subject of inquiry before the commission, under proper circumstances. The witnesses did not refuse to give any evidence on that subject.

But when the coal arrived at its destination in another State it forthwith became intermingled with the property of such State and subject to its jurisdiction, and the Commission was without jurisdiction to require the witnesses to answer questions as to the selling price of coal.

These principles are firmly established by the decisions of this court. *Brown* v. *Houston*, 114 U. S. 622; *Pittsburg Coal Co.* v. *Beet*, 156 U. S. 577; *Coe* v. *Errol*, 116 U. S. 517; *Hopkins* v. *United States*, 171 U. S. 578; *United States* v. *Knight*, 156

U. S. 1; *Kelley* v. *Rhoads*, 188 U. S. 1, and cases cited on p. 5; *Diamond Match Co.* v. *Ontonagon*, 188 U. S. 82.

Congress could not give the commission power to inquire into the intra-state business of common carriers. It is clear that it did not intend to do so; see § 12, limiting inquiries to "common carriers, subject to the provisions of this act."

When the act is read as a whole, it shows it was not intended to give the commission the power to inquire into the business of coal mining companies, or of coal mining, or of selling coal, even if coal mining corporations turn out to be railroad corporations, or corporations owned by railroads, where that is permitted, as in Pennsylvania. *Com.* v. *Erie*, 132 Pa. St. 591; 139 Pa. St. 457. See Purd. Dig. ed. Kay & Bro. 1895, vol. 1, 49 pl. 202. The new constitution of Pennsylvania did not affect preëxisting chapter. *Hays* v. *Commonwealth*, 82 Pa. St. 524.

The business of such corporations engaged in mining and selling coal in Pennsylvania, whether that business is regarded as appertaining to real estate, *Brine* v. *Ins. Co.*, 96 U. S. 627, or domestic commerce touching personal property, *United States* v. *Knight*, 156 U. S. 1, 11, is all domestic business subject to the laws of the State of Pennsylvania, and not subject to the provisions of the Interstate Commerce Act. *Penna. R. R.* v. *Duncan*, 11 Pa. St. 352; *Gloninger* v. *Railroad Co.*, 139 Pa. St. 324; *Ahe* v. *Rhoads*, 84 Pa. St. 324; *Williamsport Pass. Ry.* v. *Williamsport*, 120 Pa. St. 1, 11.

The constitutional rights of appellees are invaded by this attempt to take their private papers from them for inspection of Hearst. *Boyd* v. *United States*, 116 U. S. 627.

MR. JUSTICE DAY, after making the foregoing statement, delivered the opinion of the court.

A motion is made to dismiss the appeal upon the ground that no direct appeal lies to this court from the order of the Circuit Court. The act of February 19, 1903, (Comp. Stat.

1901, Sup. for 1903, p. 365,) to further regulate commerce with foreign nations and among the States, § 3, closing paragraph, enacts, "*Provided*, That the provisions of an act entitled 'An act to expedite the hearing and determination of suits in equity pending or hereafter brought under the act of July second, eighteen hundred and ninety, entitled 'An act to protect trade and commerce against unlawful restraints and monopolies,' 'An act to regulate commerce,' approved February fourth, eighteen hundred and eighty-seven, or any other acts having a like purpose that may be hereafter enacted, approved February eleventh, nineteen hundred and three,' shall apply to any case prosecuted under the direction of the Attorney General in the name of the Interstate Commerce Commission."

The second section of the act of February 11, 1903, (Comp. Stat. of 1901, Sup. for 1903, p. 376,) provides, "That in every suit in equity pending or hereafter brought in any Circuit Court of the United States under any of said acts [having reference to the anti-trust act of 1890 and the act to regulate commerce mentioned in the preceding section] wherein the United States is complainant, including cases submitted but not yet decided, an appeal from the final decree of the Circuit Court will lie only to the Supreme Court and must be taken within sixty days from the entry thereof."

In support of the motion to dismiss it is argued that the language of the proviso of section 3, above quoted, "shall apply to any case prosecuted under the direction of the Attorney General in the name of the Interstate Commerce Commission," must be read in connection with preceding paragraphs of the section, which provide for bringing actions by direction of the Attorney General in the Circuit Courts of the United States, and do not include proceedings of the character of the present action to compel the production of books and papers and the giving of testimony by witnesses called before the commission.

It is true that the office of a proviso, strictly considered, is to make exception from the enacting clause, to restrain generality and to prevent misinterpretation. *Minis* v. *United*

*States,* 15 Pet. 423; *Austin* v. *United States,* 155 U. S. 417, 431; *White* v. *United States,* 191 U. S. 545, 551. It is apparent that this proviso was not inserted in any restrictive sense or to make clear that which might be doubtful from the general language used. It was inserted for the purpose of enlarging the operation of the statute so as to include a class of cases not otherwise within the operation of the section. It may be admitted that this use of a proviso is not in accord with the technical meaning of the term or the office of such part of a statute when properly used. But it is nevertheless a frequent use of the proviso in Federal legislation to introduce, as in the present case, new matter extending rather than limiting or explaining that which has gone before.

In *Chesapeake & Potomac Tel. Co.* v. *Manning,* 186 U. S. 238, 242, the subject was under consideration, and Mr. Justice Brewer, delivering the opinion, while recognizing the restrictive office of a proviso as stated by Mr. Justice Story in *Minis* v. *United States,* 15 Pet. 423, 445, added: "While this is the general effect of a proviso, yet in practice it is not always so limited. As said in *Georgia Banking Company* v. *Smith,* 128 U. S. 174, 181: 'The general purpose of a proviso, as is well known, is to except the clause covered by it from the general provisions of the statute, or from some provisions of it, or to qualify the operation of the statute in some particular. But it is often used in other senses. It a common practice in legislative proceedings, on the consideration of bills, for parties desirous of securing amendments to them to precede their proposed amendments with the term "provided," so as to declare that, notwithstanding existing provisions, the one thus expressed is to prevail, thus having no greater signification than would be attached to the conjunction "but" or "and" in the same place, and simply serving to separate or distinguish the different paragraphs or sentences.' "

The provision in the statute under consideration being intended to enlarge rather than limit the application of previous terms should not receive so narrow a construction as to defeat

its purpose. It extends the terms of the act of February 11, 1903, to "any case" brought under the direction of the Attorney General in the name of the Interstate Commerce Commission. The second section of the act of February 11, has reference, it is true, to a suit in equity under certain acts wherein the United States is complainant, and the argument is that the extension of the terms of this act in the act of February 19 is only to suits in equity. But for some reason Congress, in the act under consideration, saw fit not to limit the terms of the extension to suits or proceedings provided for, in section 3 of the act of February 19, or to suits in equity, but broadly extended the rights and privileges of the act of February 11, to "cases" of the character designated. We cannot assume that this use of the broader term was without purpose. Before the passage of this act this court had held that a petition filed under section twelve of the interstate commerce act against a witness duly summoned to testify before the commission, to compel him to testify, or to produce books, documents and papers relating to the matter in controversy, makes a case or controversy to which the judicial power of the United States extends. *Interstate Commerce Commission* v. *Brimson,* 154 U. S. 447. The object of construction, as has been often said by the courts and writers of authority, is to ascertain the legislative intent, and, if possible, to effectuate the purposes of the lawmakers. We cannot read these statutes without perceiving the manifest purpose of Congress to facilitate the disposition of cases brought under the direction of the Attorney General to enforce the provision of the anti-trust and interstate commerce statutes. The present proceeding is not merely advisory to the commission, but, as was said in *Interstate Commerce Commission* v. *Brimson, supra,* a judgment rendered will be a final and indisputable basis of action as between the commission and the defendant, and furnish a precedent for similar cases. While it has for its object the obtaining of testimony in aid of proceedings before the commission, it is evident that important questions may be in-

volved touching the power of the commission and the constitutional rights and privileges of citizens. Congress deemed it imperative that such cases, affecting the commerce of the country as well as personal rights, should be promptly determined in a court of last resort.

If the appeal in the first instance was to the Court of Appeals the judgment of that court would not be final under the act of March 3, 1891, and in such case this court would still be required to consider the cases on final appeal. We think it was the purpose of the act to eliminate an appeal to the Circuit Court of Appeals and to permit the litigation to be shortened by a direct appeal to this court.

We pass now to the merits of the controversy. The record in this case is voluminous, and much of the discussion before the commission is printed. We shall endeavor to classify and consider the questions made so as to indicate our holdings with a view to a proper judgment in the case.

It is urged that the complainant before the commission did not show any real interest in the case brought, and that the proceeding should for that reason have been dismissed. It is provided in the act to regulate commerce, sec. 13, that "any person, firm, corporation," etc., complaining of anything done or omitted to be done by any common carrier subject to the provisions of this act, in contravention of the provisions thereof may apply to said commission by petition, etc. And certain procedure is provided for—and (said commission) "may institute any inquiry on its own motion in the same manner and to the same effect as though complaint had been made," and the section concludes: "No complaint shall at any time be dismissed because of the absence of direct damage to the complainant." In face of this mandatory requirement that the complaint shall not be dismissed because of the want of direct damage to the complainant, no alternative is left the commission but to investigate the complaint, if it presents matter within the purview of the act and the powers granted to the commission.

Power is conferred upon the commission, under section 12 of the act as amended March 2, 1889, and February 10, 1891, (3 U. S. Comp. Stat. of 1901, p. 3162,) to inquire into the management of the business of all common carriers subject to the provisions of the act, and to keep itself informed as to the manner and method in which the same is conducted, with the right to obtain from such common carriers full and complete information necessary to enable the commission to perform the duties and carry out the objects for which it was created.

In making the orders which were the basis of the application to the Circuit Court and in the petition filed therein it is set forth that the commission at the time when the witnesses refused to produce the contracts required, was engaged "in the discharge of its duty to execute and enforce the provisions of the act to regulate commerce and in the exercise of its authority to inquire into the business of common carriers subject to the provisions of the act, and to keep itself informed as to the manner and method in which said business is conducted, and to obtain from said common carriers full and complete information necessary to enable it to perform the duties and carry out the objects for which it was created; and your petitioner is of the opinion that said contracts are not only material and relevant to the issues on trial in said proceeding, but that the production thereof as required by it, as aforesaid, is necessary to enable your petitioner to discharge its duty and execute and enforce said provisions of said act to regulate commerce and to inform your petitioner as to the manner and method in which the business of said common carriers is conducted, and to enable your petitioner to obtain the full and complete information necessary to enable your petitioner to perform the duties and carry out the objects for which it was created."

But in the present case, whatever may be the right of the commission to carry on an investigation under the general powers conferred in section 12, this proceeding was under the

complaint filed, and we will examine the testimony offered with a view to its competency under the allegations made by the complainant.

Coming now to the specific items of testimony, which the Circuit Court in dismissing the petition considered irrelevant to the controversy, we will first consider the so-called coal purchase contracts.

It is unnecessary for the present purpose to go into detail as to the provisions of these contracts. In the main they were made with coal companies owned principally by the railroad companies, and contain the same general provisions. Among others, the purchase price of anthracite coal above a certain size is to be 65 per cent of the average price, computed monthly, at certain tide points, of coal of the same quality and size. All the coal mined by the contracting operators is sold, shipments to be made as called for by the purchasers.

While the contracts were produced for inspection, the witnesses refused to permit them to be given in evidence. The Circuit Court held them to be irrelevant upon the ground that they related solely to an interstate transaction—the sale of the coal in Pennsylvania—and had nothing to do with interstate commerce. It appears that the railroad companies proceeded against in the complaint are engaged in carrying coal from the anthracite coal regions to tidewater. The contracts are between certain coal companies and independent operators engaged in mining coal in that region. The testimony shows that the coal companies making the contracts are principally owned by the railroad companies. For what purpose this separate ownership is maintained it is not necessary now to inquire. The fact of such ownership is undisputed, and for the present purpose it may be conceded that the ownership is lawful under the laws of the State of Pennsylvania.

The railroads are all engaged in interstate commerce, and into their affairs and methods of doing business the commission might be, and is, lawfully authorized by the commerce act to make investigation. In speaking of this power as under-

taken to be vested in the commission, this court said in the *Brimson* case, 154 U. S. 447, 472: "It was not disputed at the bar, nor indeed can it be successfully denied, that the prohibition of unjust charges, discriminations or preferences by carriers engaged in interstate commerce, in respect to property or persons transported from one State to another, is a proper regulation of interstate commerce, or that the object that Congress has in view by the act in question may be legitimately accomplished by it under the power to regulate commerce among the several States. In every substantial sense such prohibition is a rule by which interstate commerce must be governed, and is plainly adapted to the object intended to be accomplished. The same observation may be made in respect to those provisions empowering the commission to inquire into the management of the business of carriers subject to the provisions of the act, and to investigate the whole subject of interstate commerce as conducted by such carriers; and, in that way, to obtain full and accurate information of all matters involved in the enforcement of the act of Congress. It was clearly competent for Congress, to that end, to invest the commission with authority to require the attendance and testimony of witnesses, and the production of books, papers, tariffs, contracts, agreements and documents relating to any matter legally committed to that body for investigation."

In *Interstate Commerce Commission* v. *Cincinnati, New Orleans &c. Railway Co.*, 167 U. S. 479, 506, this court held that the commission had no power to fix rates. In the course of the opinion it was said: "It [the commission] is charged with the general duty of inquiring as to the management of the business of railroad companies, and to keep itself informed as to the manner in which the same is conducted, and has the right to compel complete and full information as to the manner in which the same is conducted."

The testimony shows that much of the coal purchased under these contracts is sold in Pennsylvania, but a considerable portion is carried to tidewater. The coal is purchased by

companies owned by the railroads, for which payment is made on the basis of 65 per cent of the general average price received at tidewater by the sale of sizes above pea coal, leaving 35 per cent for the purchaser, from which he must pay transportation charges and cost of sale.   Here is a railroad company engaged at once in the purchase of coal through a company which it practically owns and the transportation of the same coal through different States to the seaboard.   Why may not the Interstate Commerce Commission, under the powers conferred, and under this complaint, inquire into the manner in which this business is done?   It has the right to know how interstate traffic is conducted, the relations between the carrier and its shippers and the rates charged and collected.   We see no reason why contracts of this character, which have direct relation to a large amount of its carrying trade, can be withheld from examination as evidence by the commission.   These contracts were made by the officials of the railroad companies, who were also officials of the coal companies, after protracted conferences.   Upon the ground that they pertained to the manner of conducting a material part of the business of these interstate carriers, which was under investigation, we think the commission had a right to demand their production.   And, further, it was claimed that, while these contracts were in form purchases of coal, their real purpose was to fix a rate for transportation to the carriers, who were in fact paid for the only interest they had in the coal—the right to receive pay for its transportation—by the percentage retained from the selling price after deducting charges and expenses in marketing the coal.

It is to be remembered in this connection that we are not dealing with the ultimate fact of controversy or deciding which of the contending claims will be finally established.   This is a question of relevancy of proof before a body not authorized to make a final judgment, but to investigate and make orders which may or may not be finally embodied in judgments or decrees of the court.   If the railroad companies in fact re-

ceived their compensation for carriage from the sum retained by the coal companies as was claimed, then whether they realized more or less than their published rates depended upon the price of coal. Taking the prices at times as shown in the statements filed with the commission, it is apparent that the 35 per cent was less than published rates, and if that was the sum received for transportation, would work a discrimination against coal companies not having such contracts and paying the full rate. On the other hand, if the coal companies paid the full rate, and failed to realize as much from the percentage of the selling price retained they would be losing money, and as they were owned by the railroad companies the loss would be ultimately theirs and not the coal companies. It may be that the commission or the courts will untimately find that these contracts do not fix the compensation received by the carriers, and that, as claimed, the full rate is paid by these purchasing companies, and if there is a loss on these contracts it is made up in other business; but, as we have said, the question concerns the relevancy of proof and not whether it finally establishes the issue made, one way or the other. Relevancy does not depend upon the conclusiveness of the testimony offered, but upon its legitimate tendency to establish a controverted fact. Relevancy is that "quality of evidence which renders it properly applicable in determining the truth or falsity of the matter in issue between the parties to a suit." 1 Bouvier Law Dic. Rawle's Revision, 866.

The inquiry of a board of the character of the Interstate Commerce Commission should not be too narrowly constrained by technical rules as to the admissibility of proof. Its function is largely one of investigation and it should not be hampered in making inquiry pertaining to interstate commerce by those narrow rules which prevail in trials at common law where a strict correspondence is required between allegation and proof.

It is contended in the answers filed in the Circuit Court that to require the production of these contracts would be to compel

the witnesses to furnish evidence against themselves which might result in forfeiture of estate in violation of the Fifth Amendment to the Constitution; would subject the parties to unreasonable searches and seizure of their papers contrary to the Fourth Amendment, and would require them to produce papers pertaining wholly to intrastate affairs in violation of the reserved rights of the people of the States, and beyond the power of the commission, whose duties are limited to investigations pertaining to interstate commerce.

At the hearing the constitutional objections do not seem to have been relied upon; those argued pertained to the relevancy of the proof and the rights of persons not before the court to be protected from the publication of their private contracts. As to the constitutional objection based upon the Fifth Amendment, the act as amended February 11, 1893, expressly extends immunity from prosecution or forfeiture of estate because of testimony given in pursuance of the requirements of the law. The full consideration of the subject and the decision of this court in *Brown* v. *Walker*, 161 U. S. 591, renders further consideration of this objection unnecessary.

The origin and interpretation of the Fourth Amendment to the Constitution, securing immunity from unreasonable searches and seizures, was fully discussed by Mr. Justice Bradley in the leading case of *Boyd* v. *United States*, 116 U. S. 616. In that opinion the learned Justice points out the analogy between the Fourth and Fifth Amendments, and the object of both to protect a citizen from compulsory testimony against himself, which may result in his punishment or the forfeiture of his estate, or the seizure of his papers by force, or their compulsory production by process for the like purpose. In the course of the opinion it is said: "Breaking into a house and opening boxes and drawers are circumstances of aggravation; but any forcible and compulsory extortion of a man's own testimony or of his private papers to be used as evidence to convict him of crime or to forfeit his goods is within the condemnation of that judgment. In this regard the Fourth and

Fifth Amendments run almost into each other." And see *Adams v. People of the State of New York*, 192 U. S. 585, decided at this term.

As we have seen, the statute protects the witness from such use of the testimony given as will result in his punishment for crime or the forfeiture of his estate. Testimony given under such circumstances presents scarcely a suggestion of an unreasonable search or seizure. Indeed, the parties seem to have made little objection to the inspection of the papers, the contest was over their relevancy as testimony. Nor can we see force in the suggestion that these contracts were made with persons not parties to the proceeding. Undoubtedly the courts should protect non-litigants from unnecessary exposure of their business affairs and papers. But it certainly can be no valid objection to the admission of testimony, otherwise relevant and competent, that a third person is interested in it.

As to the so-called Temple Iron Company contracts: It appears that in 1889 certain operators in the anthracite coal region organized a competing railroad, with a view to carrying their product from the coal regions to market at tidewater. It became evident that this company was likely to succeed, and to construct a competing railroad from the coal fields to the sea. With a view to acquiring its property, five of the leading railroad carriers purchased the collieries whose proprietors were developing the new scheme. To pay for these the charter of the Temple Iron Company was purchased and its capital stock increased. The company issued a large amount of stock and bonds, and the contracting railroad companies agreed among themselves and with the Guaranty Trust Company of New York, as trustee, to guarantee a six per cent dividend upon the Temple Iron Company stock and the payment of principal and interest of the bonds. This ended the building of an independent line, and the transportation of coal from the collieries is distributed among the carriers interested.

It is argued that these contracts, if given in evidence, will tend to show a pooling of freights, in violation of the fifth

section of the commerce act. While this testimony may not establish such an arrangement as is suggested, it has, in our opinion, a legitimate bearing upon the question. There is a division of freight among several railroads, where, by agreement or otherwise, the companies have a common interest in the source from which it is obtained. Furthermore, we think the testimony competent as bearing upon the manner in which transportation rates are fixed, in view of determining the question of reasonableness of rates, into which the commission has a right to inquire. To unreasonably hamper the commission by narrowing its field of inquiry beyond the requirements of the due protection of rights of citizens will be to seriously impair its usefulness and prevent a realization of the salutary purposes for which it was established by Congress.

An appeal is also prosecuted from the refusal of the Circuit Court to order the witnesses Eben B. Thomas and William H. Truesdale to answer certain questions respecting the prices and sale of coal. Upon the principles already discussed we think these questions had legitimate bearing upon the matters into which the commission was making inquiry.

We are of the opinion that the Circuit Court erred in holding the contracts for the purchase of coal by the companies or directly by the railroad, where a percentage of the price was agreed to be paid for the coal, to be irrelevant, and in refusing to order their production as evidence by the witnesses who are parties to the appeal, and likewise erred as to the Temple Iron Company contracts, and in refusing to require the witnesses aforesaid to answer the questions stated in the petition, and the order appealed from is reversed, and the cause is remanded to the Circuit Court for further proceedings in accordance with this opinion.

MR. JUSTICE BREWER dissents.