**JERSEY CITY (VINSON, Economic Stabilization Director, Intervener), v. UNITED STATES et al.**

**Civ. A. No. 3073.**

District Court, D. New Jersey.

Jan. 12, 1944.

Charles Hershenstein and Charles A. Rooney, both of Jersey City, N. J., and S. S. Eisen, of New York City, for plaintiff, Jersey City.

Harry R. Booth, of Washington, D. C., for intervenor, Fred M. Vinson, Director of Office of Economic Stabilization.

John F. Finerty, Thomas A. Halleran, and John E. Buck, all of New York City, for defendant Hudson & Manhattan R. Co.

Edward M. Reidy, of Washington, D. C., for defendant Interstate Commerce Commission.

Thorn Lord, U. S. Dist. Atty., of Trenton, N. J., for defendant United States of America.

Before McLAUGHLIN, Circuit Judge, and FAKE, and MEANEY, District Judges.

McLAUGHLIN, Circuit Judge.

In this case the plaintiff, City of Jersey City, New Jersey, and the intervener plaintiff, Fred M. Vinson, Economic Stabilization Director, prayed this court to set aside, annul and perpetually enjoin, pursuant to Sections 41(28) and 47 of the Judicial Code, 28 U.S.C.A. §§ 41(28), 47, the rate order issued by Interstate Commerce Commission on June 8, 1943 in a matter titled Investigation and Suspension Docket No. 4394, Passenger Fares of Hudson & Manhattan Railroad Company, 255 I.C.C. 649, and a supplemental order issued therein on November 2, 1943. 256 I.C.C. ——. The order of June 8, 1943 authorized the said carrier to increase the fare on its downtown line (extending from Jersey City and Hoboken, New Jersey, to Hudson Terminal in downtown New York City, New York) from 8 to 9 cents, for the duration of the war and six months thereafter, or until otherwise ordered by the Commission. The supplemental order of November 2, 1943 authorized the carrier, in lieu of the 9 cent downtown fare, to charge a cash fare of 10 cents or a token fare on a basis of eleven tokens for $1, upon establishing an identical fare on the carrier's uptown line; the present uptown fare being 10 cents, without a token fare. On November 26, 1943, after a hearing, this court issued an interlocutory injunction suspending the enforcement of said rate orders pending final hearing on the merits.

### Full and Fair Hearing

At the outset we are confronted with the vitally important question of whether the plaintiff and intervener were given a full and fair hearing by the Commission. From the facts, the petition by the carrier to the Commission was one for additional revenue. The orders of the Commission were based upon Section 15(1) of the Interstate Commerce Commission statute, 49 U.S.C.A. § 15(1), which specifically provides for a full hearing. The United States Supreme Court in Interstate Commerce Commission v. Louisville & Nashville Railroad Co., 227 U.S. 88, 33 S.Ct. 185, 57 L.Ed. 431, stresses this. The Supreme Court said in that case at page 93 of 227 U.S., at page 187 of 33 S.Ct.: "The Commission is an administrative body and, even where it acts in a quasi judicial capacity, is not limited by the strict rules, as to the admissibility of evidence, which prevail in suits between private parties. Interstate Commerce Comm. v. Baird, 194 U.S. 25, 24 S.Ct. 563, 48 L.Ed. 860. But the more liberal the practice in admitting testimony, the more imperative the obligation to preserve the essential rules of evidence by which rights are asserted or defended. In such cases the Commissioners cannot act upon their own information as could jurors in primitive days. All parties must be fully apprised of the evidence submitted or to be considered, and must be given opportunity to cross-examine witnesses, to inspect documents, and to offer evidence in explanation or rebuttal. In no other way can a party maintain its rights or make its defense. In no other way can

it test the sufficiency of the facts to support the finding; for otherwise, even though it appeared that the order was without evidence, the manifest deficiency could always be explained on the theory that the Commission had before it extraneous, unknown, but presumptively sufficient information to support the finding. United States v. Baltimore & Ohio S. W. R. Co., 226 U.S. 14, 33 S.Ct. 5, 57 L.Ed. 104."

In the report and order of the Interstate Commerce Commission of June 8, 1943 appears the following: "Based on the foregoing facts and estimates, respondent points out that under present fares it would be necessary for its annual traffic to increase by about 30 percent over that of 1941 in order to meet the current interest requirements on its bonded indebtedness."

The same report and order also stated: "It should be understood that if at any time prior to the expiration of that period, by reason of changed conditions or otherwise the revenue results to respondent should prove to be materially different from those estimated in this report, any party to this proceeding is of course at liberty to seek to bring the facts with respect thereto to our attention at a further hearing."

Following that order of June 8, 1943, the carrier filed a supplemental petition alleging inability to collect the allowed 9 cent fare and asking for a token fare which amounted to 9⅒ cents and in the alternative, a 10 cent cash fare. The intervener filed an answer to that supplemental petition asking that the Commission " 'in view of petitioner's tremendously improved current earnings * * *' to 'reconsider its previous modification of its original order and return petitioner's downtown fares to the original level of 8¢. This will serve the national program to keep down the cost of living.' "

Then followed the Interstate Commerce Commission order of August 3, 1943 which allowed the prayer of the supplemental petition of the carrier. Thereafter, the municipal plaintiff filed its bill of complaint in this court with Fred M. Vinson, Economic Stabilization Director, intervening as a co-plaintiff. After that, the Interstate Commerce Commission, of its own motion, held a supplemental hearing which it confined solely to the practicability of the 9 cent fare. At that hearing both the intervener plaintiff and the municipal plaintiff attempted to present evidence relating to the 1943 earnings of the carrier for the purpose of showing that under such earnings no increase in fare whatsoever was justified. This offer was rejected by the examiner for the Commission. Both plaintiffs objected to such limitation of the scope of the hearing. In addition, cross-examination of a carrier witness by the plaintiffs as to a $240,000 charge for expenses alleged by the carrier and called War Damage Reserve, was refused by the examiner although it was strenuously suggested that such item was no longer acceptable, at least for any such amount. Thereafter the intervener plaintiff petitioned the Commission to modify its order of September 18, 1943 which limited the scope of the further hearing and to permit testimony of the earnings of the carrier since the original closing of the record, alleging that the record as it then stood was stale and did not reflect the true picture. The municipal plaintiff informally joined in that application by letter. The Commission, in its opinion of November 2, 1943, said concerning the offer to submit evidence of the carrier's 1943 earnings: "Considering the contents of the motion now before us, and the offers of additional evidence made at the recent further hearing, we have no reason to believe that, if the additional hearing sought were held, we would feel warranted in modifying our findings as made in the second report * * * the motion will therefore be overruled."

Obviously, from the above language, the Commission was not concerned with the technical niceties of the effort to present the desired testimony. It actually considered the proposed evidence and decided that, despite it, its decision should stand. The municipal plaintiff and the intervener, by that evidence, offered to show that the carrier's rise in business and net earnings had completely removed any reason for an increase over the 8 cent fare. In refusing to consider such testimony which, under the terms of its tender, went to the heart of the controversy, in our judgment the Commission did act arbitrarily and contrary to the mandate of its statute. As Mr. Chief Justice Hughes said in Atchison, Topeka & Santa Fe Railway Co. v. United States, 284 U.S. 248, at page 262, 52 S.Ct. 146, at page 150, 76 L.Ed. 273: "We think that this action was not within the permitted range of the Commission's discretion, but was a denial of right."

In that case, which seems very much in point here, the court also said, speaking as to the function of the Interstate Commerce Commission in such circumstances, page 262 of 284 U.S., page 150 of 52 S.Ct., 76 L.Ed. 273: "In the discharge of its duty, a fair hearing is a fundamental requirement. Interstate Commerce Comm. v. Louisville & Nashville R. Co., 227 U.S. 88, 91, 33 S.Ct. 185, 57 L.Ed. 431. In the instant proceeding, the hearing accorded related to conditions which had been radically changed, and a hearing, suitably requested, which would have permitted the presentation of evidence relating to existing conditions, was denied."

■ We do not see that the contentions raised by the defendants that the plaintiffs are estopped from questioning the validity of the orders of June 8, 1943 and November 2, 1943; and that the action is prematurely brought, are answers to the above. Starting with the intervener's answer on July 19, 1943 to the carrier's supplemental petition, these plaintiffs have ever since that time been specifically requesting the Commission to reconsider its increase in fare order, in view of the carrier's tremendously improved current earnings. The intervener did it formally in its answer above referred to. Both plaintiffs strenuously urged it at the supplemental hearing and thereafter by the petition above referred to in which the Commission was requested to broaden the scope of its supplemental hearing so as to include evidence as to the carrier's 1943 earnings. The Commission order of November 2, 1943 definitely decided that such new evidence would not be admitted. That order permitted the carrier to file and make effective the new tariffs on fifteen days' notice. The Commission took the position that it was without power to further suspend the tariffs. In reality, therefore, both plaintiffs had exhausted their remedy before the Commission. In connection with this, the language of the order of June 8th above quoted permitted any party to the proceeding to bring any changed conditions resulting in a different revenue situation to the attention of the Commission for a further hearing.

■ In passing, we do not see either under the I.C.C. statute or the relevant decisions that any request for rehearing is actually required prior to suit in this court. In Baltimore & Ohio Railroad Co. v. United States, 298 U.S. 349, at page 371, 56 S. Ct. 797, at page 809, 80 L.Ed. 1209, the United States Supreme Court held: "No act of Congress requires carriers, in advance of suit to set aside divisions or other orders, to petition the commission for rehearing, repeal or modification. Nor has Congress attempted to limit the time within which the carrier may sue to enjoin enforcement of an order of the Commission prescribing rates or divisions."

By the language of its order of November 2, 1943, the Commission indicates plainly that it had actually passed upon and rejected the offer of the plaintiffs to present the 1943 earnings of the carrier in an effort to show that any increase in fare under the true present facts was not justified. In such situation the remedy of the plaintiffs before the Commission was exhausted; with the plaintiffs, if they wished to pursue the matter further, having no recourse but to come to this court under the statute.

### Economic Stabilization

We do not see that this phase of the case can be lightly brushed aside. Under present conditions, we doubt if its importance can be readily overestimated. Were these orders issued in violation of the national emergency policy of economic stabilization? The Commission said in its order of June 8, 1943: "It seems to us that an increase of 1 cent in respondent's downtown fare is unlikely to have any inflationary effect, and that the effect thereof upon the cost of living, while a factor to be given consideration, will be so slight, a maximum of about 12 cents a week and 52 cents a month per passenger, as to be negligible." 255 I.C.C. 649, 668.

By that language, the Commission undoubtedly realized that the problem of inflation of the cost of living was involved in this particular rate increase. The Commission, without even considering the substantial proportionate increase as to the total fare, which amounts to approximately thirteen per cent, but simply having in mind the small amount in money the increase meant to each passenger taken alone, dismissed this phase of the matter as negligible. We do not see that there was ever any claim by the Director of Economic Stabilization that the raise in rates here by and of itself would result directly in inflation. The gauge urged on behalf of Director Vinson was that set out in United States Gypsum Co. v. Brown, 137 F.2d 360, at page 364, where the United States

Emergency Court of Appeals, speaking through Chief Judge Maris, said: "The mere fact that the increase is small and therefore will not bear too hardly upon either party to a sale is of no consequence. It is the cumulative effect of millions of small increases in prices and other costs throughout the economy which starts the inflationary spiral. See Lincoln Sav. Bank v. Brown, Em.App., 137 F.2d 228."

In the case of Philadelphia Coke Company v. Bowles, Em. App. December 15, 1943, 139 F.2d 349, 353, the court said: "In a complicated economy such as ours the phenomena of price increases are the result of a complex of causes, the interaction of many economic forces. When inflationary pressure is one of the major forces operating in the economy it is wholly unrealistic to consider the price of a single commodity as in an economic vacuum and say that no threat of an inflationary increase can be discovered. Each commodity price must then be considered in the light of the fact that it forms an integral part of the whole price structure."

For the Interstate Commerce Commission to permit the Director to intervene is not enough under the relevant statutes, orders and directives with reference to price stabilization. It is, of course, true that the Price Administrator does not have the authority to regulate carrier rates nor is such authority claimed here by the intervener, but it is apparent that the Executive Orders issued with reference to stabilization do furnish a basic guide for all government agencies concerned, including the Interstate Commerce Commission. The President's Executive Order No. 9250, issued October 3, 1942, 50 U.S.C.A. Appendix, § 901 note, reads in part: "The guiding policy of the Director and of all departments and agencies of the Government shall be to stabilize the cost of living in accordance with the Act of October 2, 1942."

The President's Order of April 8, 1943, ,No. 9328, 50 U.S.C.A.Appendix, § 901 note, reads: "The attention of all agencies of the Federal Government, and of all State and municipal authorities, concerned with the rates of common carriers or other public utilities, is directed to the stabilization program of which this order is a part so that rate increases will be disapproved and rate reductions effected, consistently with the Act of October 2, 1942, * * * and other applicable federal, state or municipal law, in order to keep down the cost of living and effectuate the purposes of the stabilization program."

It does seem from these that the Commission here is under a distinct duty in this particular case to give full effect to war time conditions and the stabilization legislation. It seems further, that in characterizing the allowed increase to this carrier as negligible and not directly causing inflation, that the Commission has failed to consider the dangerous, cumulative effect of the present allowed increase in connection with all the other cumulative sources of inflation, perhaps small in themselves, but tending collectively to defeat the vital policy of controlling inflation as indicated in the above-referred to Executive Orders of the President and the Act of October 2, 1942, 50 U.S.C.A.Appendix, § 961 et seq.

In view of the conclusions we have reached, there is no necessity for discussing the other points raised by the plaintiff and intervener. A permanent injunction will issue against the Interstate Commerce Commission as to its orders of June 8, 1943 and November 2, 1943 with respect to the increase in fare on the carrier's downtown line as set out in said orders.

FAKE, District Judge (dissenting).

This is not the first time the passenger rates of the Hudson & Manhattan Railroad Company have been considered by this court. The company filed a local passenger tariff to become effective September 1, 1937, providing for a 10 cent fare on its downtown line. This led to protests and extended hearings resulting in the establishment of a rate of 8 cents by the Commission, two members thereof dissenting because they believed the 10 cent fare to be justified. Resort was then had to this court resulting in the sustaining of the 8 cent rate so established. The opinion of this court on the subject is found in Hudson & Manhattan Railroad Company v. United States, 33 F.Supp. 495, affirmed, 313 U.S. 98, 61 S.Ct. 884, 885, 85 L.Ed. 1212. Therefore, the issues now before us do not come without some knowledge of the prior record.

I agree with the prevailing opinion that the dispositive issues here arise on the question of arbitrary action by the Commission in refusing to receive and consider evidence offered by the Price Administrator and the City of Jersey City on September 28, 1943. An examination of the proffered

evidence discloses on its face that it transcends the limitations placed on the receipt of evidence by the Commission in its reopening order of September 18, 1943.

In this connection it is found on looking back over the record that an 8 cent fare as established in 1938 has continued in actual operation down to the present time. On June 27, 1942, the Railroad Company petitioned the Commission for a further hearing and again sought authority to charge 10 cents on its downtown line. Replies were filed to this petition by the City of Jersey City and divers others, and on July 13, 1942, the Commission issued an order opening the proceedings. Commencing on September 9, 1942, and running through September 19, 1942, hearings were held bearing upon the issues involved on the petition and replies. On September 17, 1942, the Price Administrator entered an appearance on the record and reserved the right to be heard and to file a brief. His representative was then asked whether he desired to introduce any evidence and his answer was "Not at this time". On November 13, 1942, the Commission issued an order permitting the Price Administrator to intervene. Sometime during January or February, 1943, a proposed report by the Commission was issued.

On March 8, 1943, exceptions to the proposed report were filed by the Price Administrator and also by the City of Jersey City and six other municipalities and divers bus lines. On March 18, 1943, the Railroad Company filed a reply to the exceptions. On April 20, 1943, a stipulation to supplement and bring the record up to date was filed showing the total patronage and revenues of the Railroad Company for the months of January and February, 1943, and on that date oral argument covering all the issues then pending took place before the Commission. On June 8, 1943, the Commission filed a report and order establishing a 9 cent fare on the downtown line, three of the Commissioners however maintaining the view that a flat fare of 10 cents was reasonable.

On July 8, 1943, the Railroad Company filed a petition for reconsideration and modification of the Commission's order of June 8, 1943, on the ground that mechanical difficulties prevented its operation. On July 14, 1943, the City of Jersey City et al. filed a reply to the Railroad Company's petition. On July 19, 1943, the Price Administrator filed a reply.

The petition of the Railroad Company last above mentioned and the replies thereto raised certain issues bearing on difficulties confronting the Railroad Company in the matter of the collection of the 9 cent fare, and the Commission found that by reason of the peculiar construction and operation of the mechanical fare-collecting devices, 9 cents, however divided, could not be received and properly counted in these devices; that other means of collecting that sum were impractical because in each instance they would result in unreasonable expense to the Railroad Company and involve serious delays in the discharge of its passengers. The evidence shows clearly that speedy discharge of passengers is of prime importance because the schedules of the connecting railroads are arranged to prevent traffic congestion. For these, and other reasons, the Commission entered its order of August 3, 1943, modifying its order of June 8, 1943, permitting a fare of one dime or the use of eleven tokens at $1 for eleven rides on both the uptown and downtown lines. This afforded the uptown passengers a fare of $9\frac{1}{11}\cent$ where under the prior order of June 8, 1943, they were to pay 10 cents and would cause the downtown passengers to pay $9\frac{1}{11}\cent$ where under the prior order they were to pay 9 cents. In this connection it seems to me the Commission functioned fully within its lawful sphere of action, and down to this point I am not able to find even the slightest question of arbitrary action. There was ample evidence before the Commission to bring their action within the rule laid down by the decision of the United States Supreme Court above cited, and in this connection it was not then and is not now within the province of this court to weigh the testimony and form a conclusion in conflict with the Commission's findings of fact. The Commission must be sustained whenever it appears that "there was evidence to support the Commission's findings." Such were the words of the Supreme Court.

On September 13, 1943, the City of Jersey City filed its complaint in this court and the Price Administrator was subsequently permitted to intervene in this action.

On September 18, 1943, the Commission entered its order reopening the proceedings, limiting the same as follows: "for further hearing to permit any party hereto to present evidence directed solely to the propriety and lawfulness of the modifica-

tions made by the Commission in its report of August 3, 1943 * * * that at such further hearing any party hereto shall have the right to cross-examine adverse witnesses, and, upon the conclusion of such hearing, any party so desiring may make oral argument before the examiner, but no further briefs shall be submitted, nor shall a proposed report be issued, nor shall there be further argument before the Commission." All of which clearly discloses the intent of the Commission to consider all issues closed save only the one specifically referred to.

Thereafter on September 28, 1943, and of course after the institution of the suit here, the representatives of the City of Jersey City and of the Price Administrator attempted to introduce evidence bearing upon the earnings of the carrier for the first six months of the year 1943, for the purpose of showing that there was no justification for the increased fare allowed either under the order of June 8, 1943, or the order of August 3, 1943, and that the action of the Commission was inflationary. Also it was sought to cross-examine witnesses who had appeared at prior hearings and testified in relation to a $240,000 charge made by the Railroad Company for war damage reserve. It is my view that when by stipulation as hereinbefore appears, evidence was introduced bearing upon the earnings for the months of January and February, 1943, this made the evidence reasonably current and timely. However, here the Commission functioned with open eyes within their discretionary powers and this court cannot usurp their functions on the question of reasonable time as applied to the timeliness of the record. Rate making is a highly specialized art. The Commissioners had evidence on the subject before them and listened to arguments on that point and we should not substitute our judgment for their's. Prior to June 8, 1943, the Commission had given full opportunity for the introduction of evidence and arguments were heard bearing upon the $240,000 item. As to the proffered new evidence, the Commission said in its report of November 2, 1943, " * * * we have no reason to believe that, if the additional hearing sought were held, we would feel warranted in modifying our findings as made in the second report."

Of course the flow of economic change never stops—always and forever the comings and goings and doings of man have their effect in preventing a static period at which time the Commission might stop and make a decision. Always the point of termination must be fixed in the midst of fluctuations in the economic factors involved. It is my view that this court should not enter the province of the Commission in considering the subject of inflation. They were charged with the duty of passing on it by reason of the Executive Order on that subject and dealing as they do from day to day with economic factors, they constantly are kept advised in that field, and I believe their action here resulted from close attention to all the factors involved including inflation.

A careful study of the record convinces me that there was ample evidence to sustain the validity of each of the rulings made by the Commission herein and I am therefore unable to concur in the prevailing opinion.