In re Application of Union Pacific Railroad Company.
Union Pacific Railroad Company, appellant, v.
Nebraska State Railway Commission et al.,
APPELLEES.
31 N. W. 2d 552

Filed April 1, 1948. No. 32270.

*T. F. Hamer, R. B. Hamer,* and *G. C. Holdrege,* for appellant.

*Walter R. Johnson,* Attorney General, *Erwin A. Jones,* and *Crosby & Crosby,* for appellees.

Heard before SIMMONS, C. J., PAINE, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ., and WESTERMARK, District Judge.

CHAPPELL, J.

Appellant, hereinafter called the company, filed an application with the Nebraska State Railway Commission for authority to discontinue its agency service at Keystone for the reason that its agent at Martin could render the same essential services, and public convenience and necessity no longer required agency service at Keystone because of the kind and amount of business transacted at that station. Objections were filed, and, after hearing, the company's application was denied. Motion for rehearing was overruled and the company appealed, assigning as error substantially that the order of denial was arbitrary and unreasonable. We sustain that contention.

Applicable law is well established in this jurisdiction.

This court has held that: "The prime object and real purpose of Nebraska state railway commission control is to secure adequate, sustained service for the public at minimum cost and to protect and conserve investments already made for this purpose. In doing this, primary consideration must be given to the public rather than to individuals." Thomson v. Nebraska State Railway Commission, 143 Neb. 52, 8 N. W. 2d 552.

That case is also authority for the proposition that a final order of the railway commission granting or denying a railroad company permission to discontinue an agency at a particular station is unreasonable and arbitrary unless its findings and conclusions conform to the law and are supported by the evidence.

The opinion further affirmed that the service and facilities to be furnished by a railroad company at any station need only be just, reasonable, and adequate to the requirements of the station, and should in a measure be commensurate with the patronage and receipts from that portion of the public to whom such service is rendered, and whether or not a railroad company may discontinue its agency service at any of its stations depends upon the facts and circumstances of the particular case.

In Thomson v. Nebraska State Railway Commission, 141 Neb. 697, 4 N. W. 2d 756, it was held: " 'It is not reasonable to require the maintenance of a full-time agency station when the cost of such service is out of proportion to the revenue derived from that portion of the * * * public benefited thereby, especially where a substitute service may be provided which will afford the same essential service but is less convenient.' "

In Thomson v. Nebraska State Railway Commission, 142 Neb. 477, 6 N. W. 2d 607, it was held: "The matter of time necessary to be devoted to the performance of duties by an agent of a railroad is a matter of importance in determining whether or not the railway commission acted arbitrarily and unreasonably in denying an appli-

cation for the discontinuance of an agency. * * *

"The ruling of the railway commission or of this court on the question of discontinuance of an agency at any given time does not amount to an adjudication for the future. It is only a judgment on the condition presented by the application and relates only to the time and conditions presented."

In Northern Pacific Ry. Co. v. North Dakota, 236 U. S. 585, 35 S. Ct. 429, 59 L. Ed. 735, it was said: "But, broad as is the power of regulation, the State does not enjoy the freedom of an owner."

In that connection it was said in Chicago, R. I. & P. Ry. Co. v. Nebraska State Railway Commission, 85 Neb. 818, 124 N. W. 477: "But, unless public necessity requires, the discretion of the railroad company in establishing and maintaining its stations should not be interfered with."

Therefore, in arriving at decision in the light of the foregoing authorities, this court will, with due regard for the welfare of the public, take into consideration all the facts and circumstances peculiar to the Keystone station and attendant thereon, such as its proximity to and the accessibility of other open stations; the character and volume of services rendered to and the business transacted with the public; the revenue derived therefrom, together with the cost and expense incidental thereto; the time necessarily devoted by the company's agent in the performance of his duties; and whether or not an open agency is necessary as a safety precaution in the operation of trains between stations.

Bearing that in mind, we have examined the record. It discloses that according to the 1940 census Keystone had a population of 39 persons. It is located on Highway 49, which runs south from Arthur to Keystone 27 miles, and thence west 5 miles to main Highway 61, which crosses the state from north to south and extends from Arthur south through Martin to Ogallala. It is seven miles by graveled and cindered road from Key-

stone to Martin. The depots of both are located on the company's North Platte branch line, which has its junction with the main line a short distance west of North Platte, and generally follows the North Platte River to Gering. The depot at Keystone, however, is not now located in the village itself.

Insofar as important here, the company now maintains open agency stations at Sarben, Keystone, Martin, and Lewellen, over a distance of 46.5 miles. It is 15.6 miles by rail from Keystone east to Sarben, and 6.5 miles by rail from Keystone west to Martin, or a total of 22.1 miles from Sarben to Martin. From Martin it is 24.4 miles by rail west to Lewellen. It will be observed, then, that if the agency at Keystone is discontinued, there will still be open agency stations at Sarben, Martin, and Lewellen, with Martin located approximately midway between the other two.

There is evidence that such a situation would be more satisfactory from a train-operations standpoint than having two of the stations located within close proximity, as at present. In the light of the proximity to and accessibility of Martin from Keystone by highway or rail, and the distance between Sarben and Martin, or Martin and Lewellen by rail, those factors could have but little significance in sustaining the order of the commission.

Prior to construction of the Kingsley Dam the company's line went directly through Keystone. However, when the dam was constructed a short distance to the west thereof, it was necessary for the company to leave the river valley to the east of Keystone and reconstruct its line in the hills north of the lake created by the dam. Thus the railroad no longer went through Keystone and the station itself was of necessity moved from its former location to a point 2.2 miles northeast of the village. There are no buildings now on the line at Keystone except the depot, which is identical with the one at Martin. Agents at both stations live in the depots.

The village of Keystone has two general merchan-

dise stores, one of which handles coal, gas, and oil; a bank; a telephone office; two churches; a public library; and an eighth-grade school. Its high school has been discontinued, and its high school students are now transported to Ogallala. The post office is in one of the stores, from which a mail route extends out into Arthur county. The agent at Keystone does not now handle the mail, thus discontinuance will in no substantial manner change that situation. Keystone and Martin are both on the same telephone exchange, with telephones in both depots. The one can be called as conveniently as the other. In that regard, a discontinuance of the one at Keystone could cause no inconvenience. Martin has good shipping facilities but has no business establishments.

Since construction of the dam was undertaken, Keystone has lost several of its business establishments. A lumber company and a hotel have closed. A beer parlor has closed and its building has been dismantled. An elevator has closed and been dismantled, and buildings which contained a lunch counter, pool tables, beer parlor, and candy and tobacco business were moved to Roscoe. As one of the objectors put it: "Well we still need about all we got at Keystone. During the la(s)t 20 years we haven't gained much, we have lost."

The territory surrounding Keystone is devoted mostly to the raising of livestock by ranchers who are few in number. Such livestock is the principal commodity, and, with rare exceptions, the only commodity forwarded by rail at Keystone. The shipments are usually made by ranchers during the months of September and October in cars ordered in person, by mail, or telephone from any of the company's agents or representatives at any of its accessible open stations. The cars are spotted by train crews and it has been the company's practice in the past, and will be in the future, to have one of its traffic representatives present when large shipments are made. It is not necessary to have an agent at Keystone

in order to permit the shipper to accompany his livestock shipments from Keystone. He can board the train and have his contract signed at the first available open agency. The evidence is that the company does not now accept shipments of livestock to be forwarded on bill of lading with sight draft attached at any of its stations. In that connection, the bank at Keystone could be of little importance as a factor.

The commodities received in carload quantities are mostly coal, with a few cars of feed. They average less than one a month. There are, generally speaking, only two less-than-carload receivers. They receive all such shipments except in isolated cases. Less-than-carload shipments forwarded average less than one a month while such shipments received average less than two a day. In that regard, the company now has and will continue to have pick-up and delivery service for all less-than-carload shipments received. A few such shipments are received for patrons who live in or near Arthur, but they are delivered by the mail carrier.

In the future, both carload and less-than-carload shipments received at Keystone must be prepaid, unless credit has been established by the receiver thereof with the railroad company. If prepaid, the freight charges are remitted on the invoice as one transaction, or if the merchandise received is shipped on bill of lading with sight draft attached, payment is made to the bank. If credit is established, freight charges will be remitted by mail or personally to the agent at Martin. There is evidence that some shipments even now arrive prepaid or with sight draft attached, and that some companies always ship merchandise prepaid even where there are open stations. In any event, the same essential services can be rendered with the agency discontinued, although, frankly, it will be less convenient in some respects.

Exhibits and other evidence appearing in the record illustrate beyond dispute that the revenue received at, or assignable to Keystone from all freight forwarded

and received, together with ticket sales, milk and cream traffic, less the necessary costs and expenses of handling the same, including those of the agency itself, left the company with a very substantial deficit thereat during 1944 and 1945, and a more substantial one for the first nine months of 1946. As a matter of fact, the record discloses that several of defendant's non-agency stations of comparable population produce more revenue per year than the open agency at Keystone.

It is true that Keystone has been the accounting station for three so-called blind sidings or non-agency points, but the record contains no evidence showing that the handling of such accounts at other stations will in anyway inconvenience the public. While the revenue therefrom, together with the costs and expenses incidental thereto, are not disclosed by the evidence, the small amount of business so handled is readily ascertainable, and, if included in the Keystone accounting, could not change the result.

Admittedly, the agent could and did perform all the necessary duties at the station, including menial tasks, in from two to three hours per day. He did at times receive train orders, but they averaged only one a week during 1945 and in 1946 they averaged less than three a month. The evidence is that most of them were probably only slow orders. In any event it is not disputed that such orders as would be necessary for the safe operation of trains could as well be handled by either Sarben, Martin, or Lewellen. There is a 42-car siding at Keystone which could be used for passing of trains, but in fact it has been used only for storage of cars. There are but four trains per day, and they are mixed trains, two westbound a. m. 55 minutes apart, and two eastbound p. m. three hours apart. We cannot conclude that services rendered by the agent or safety precautions required the continuance of an agent at Keystone.

It is true that there are shipping facilities at Keystone

which do not exist at Martin, but the discontinuance of the agent at Keystone will not substantially interfere with their use at either station.

Appellee argued that the company was simply attempting in this proceeding to transfer agency service from Keystone to Martin. This argument resulted from an application by citizens of Arthur County in December 1943, requesting that full agency service should be inaugurated at Martin. At that time, the company did not feel that open agency was needed at Martin, and in the alternative requested that if agency service was required at Martin, the agency service at Keystone, then handling the Martin accounts, should be discontinued. After a hearing, the railway commission on December 21, 1943, denied both contentions, from which no appeal was taken. However, it appears from the record that reenforcement of the Kingsley Dam was necessitated, and the increased volume of business from that source and others at Martin, together with the resulting difficulty of maintaining demurrage records and keeping other proper records, not only made an agency at Martin necessary but more desirable than at Keystone. Therefore, in September 1944, the company voluntarily, as they had a right to do, established an open agency at Martin. Since that time, revenue for forwarding shipments from Martin has not been as large as that from Keystone, but the revenue for freight received at Martin has been many, many times as great as that at Keystone. Since it appears from the record that such a situation has been existent and progressive since 1944, we cannot conclude that the business transacted at Martin was only temporary and non-recurrent. In any event, since 1943 the conditions have materially changed, not only at Martin but also at Keystone, and the order of the railway commission entered at that time could not now be binding upon the company or control the situation presented here.

We conclude that the order of the Nebraska State

Railway Commission denying the company permission to discontinue its agency should be and the same hereby is reversed and remanded, with directions to grant such authority.

REVERSED AND REMANDED WITH DIRECTIONS.