IN RE APPLICATION No. 19060, CHICAGO AND NORTH WESTERN RAILWAY COMPANY FOR AUTHORITY FROM THE NEBRASKA STATE RAILWAY COMMISSION TO DISCONTINUE TRAINS 21 AND 22 BETWEEN OMAHA AND NORFOLK, NEBRASKA.
CHICAGO AND NORTH WESTERN RAILWAY COMPANY, APPELLEE, v. CITY OF NORFOLK, NEBRASKA, ET AL., APPELLANTS, CITY OF OMAHA, NEBRASKA, APPELLEE.
60 N. W. 2d 662

Filed November 6, 1953. No. 33360.

*Richards, Yost & Schafersman,* for appellants.

*Neely, Otis & Cockle,* and *Herbert M. Fitle,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

WENKE, J.

The Chicago and North Western Railway Company, a common carrier, pursuant to the Nebraska State Railway Commission's general order No. 11, filed an application with the commission seeking authority to discontinue the operation of its trains Nos. 21 and 22 providing local passenger service between Omaha and Norfolk, Nebraska, via Fremont. A hearing was had on this application and, based on the evidence adduced thereat, the commission granted carrier the authority it sought. Motion asking for a new trial and rehearing was filed and, upon being denied, appeal was taken to this court.

Section 75-109, R. R. S. 1943, provides: "The State Railway Commission shall have the power to adopt rules and regulations to govern its proceedings, the mode and manner of conducting investigations and hearings of railroad companies, common carriers, and other persons before it, with reference to the fixing of any rate or rates, classifications and charges for the transportation of freight and cars, the making of any orders provided for herein, or under the laws of this state relating to the control and regulation of railway companies and common carriers, and other acts required of it by the laws of this state; * * *."

Rule 3.11 of the commission's General Rules of Practice and Procedure provides: "A protest against the granting of any application shall set forth specifically the grounds upon which it is made and contain a con-

cise statement of the interest of protestant in the proceedings. A protest must be filed with the Commission five days prior to the date of the hearing and such protest must show service of a copy thereof on the applicant or his attorney."

All of the towns and cities along the route of trains Nos. 21 and 22, including Omaha, Fremont, and Norfolk, were represented by counsel at the hearing held on appellee's application, were considered and treated as protestants thereto, and, without objection, presented evidence in opposition to the application although they had not filed a written protest thereto with the commission as Rule 3.11 provides should be done at least 5 days before. the hearing. All of these towns and cities, except Omaha, have perfected this appeal. It is apparently appellee's thought that since none of appellants filed such written protest they are not parties to the proceeding and therefore without right to appeal from the commission's order. As no objection of any kind was made by appellee to the participation of appellants in the hearing and since the commission did not require appellants to file such written protest, we find the commission waived the requirement and appellee likewise waived the service thereof upon it or its attorney.

Appellants contend there was error in the commission's receiving in evidence, over their objection, certain evidence relating to items of costs of operation as it affects these trains. Appellee, on the other hand, denies the commission erred in this regard but contends that even if it did it would not be material here since no one contends that public convenience and necessity requires the continuation of the passenger service afforded by trains Nos. 21 and 22. This latter contention is grounded on the principle that public convenience and necessity are the criteria against which any discontinuance must be measured. In this regard carrier is correct.

"It is the duty of a carrier to seek, and of regulatory

agencies to permit, the elimination of those services and facilities that are no longer needed or used by the public to any substantial extent." In re Application of Chicago, B. & Q. R. R. Co., 152 Neb. 352, 41 N. W. 2d 157.

We said in In re Application of Chicago, B. & Q. R. R. Co., 152 Neb. 367, 41 N. W. 2d 165: "While the railroad company is relieved of the necessity of meeting unnecessary and wasteful competition, it is required to meet all the needs of the territory it serves. It may not at will abandon lines or trains, or even particular types of service that railroads customarily perform. It is, therefore, a question of public need that is to be determined when application is made for additional service or to discontinue an existing service."

And in Chicago, B. & Q. R. R. Co. v. Order of Railroad Telegraphers, 155 Neb. 387, 52 N. W. 2d 238, we said: "In the final analysis, when an application is made for additional service or to discontinue an existing service, the question to be determined is the public need or lack of need therefor."

See, also, Chicago & N. W. Ry. Co. v. Public Service Comm., 329 Mich. 432, 45 N. W. 2d 520; Ann Arbor R. R. Co. v. Michigan Public Service Comm., 91 F. Supp. 668; Pennsylvania-Reading Seashore Lines v. Board of Public Utility Commissioners, 5 N. J. 114, 74 A. 2d 265.

In Chicago, B. & Q. R. R. Co. v. Order of Railroad Telegraphers, *supra,* we said: "In the case at bar, a large part of the record, briefs of counsel, and arguments as well have been devoted to the question of whether or not the carrier's theory of allocation of revenue and cost of operation at the station involved was correct. We do not consider that question of prime importance except insofar as sums involved may measure the public need by indicating the extent of use or lack of use of the services there made available by the carrier. In other words, the carrier is not required to maintain standby station agency service not comprehensively used

by the public, or to be used only when other established carriers fail to meet the need."

However, in In re Application of Chicago, B. & Q. R. R. Co., 152 Neb. 367, 41 N. W. 2d 165, we said: "In determining such questions the cost of providing the service is an important element, although not a controlling one." And in Chicago, B. & Q. R. R. Co. v. Order of Railroad Telegraphers, *supra:* "In deciding such question the cost of providing the service and revenue derived therefrom are important elements although not controlling."

"A final order of the Nebraska State Railway Commission granting a railroad company authority to discontinue specified passenger trains, operated within the state at a loss and for the operation of which no public need exists, is within the scope of its authority and not arbitrary and unreasonable." In re Application of Chicago, B. & Q. R. R. Co., 154 Neb. 281, 47 N. W. 2d 577.

"On appeal to the Supreme Court from an order of the Nebraska State Railway Commission, while acting within its jurisdiction, the question for determination is the sufficiency of the evidence to prove that the order is not unreasonable or arbitrary." In re Application of Chicago, B. & Q. R. R. Co., 152 Neb. 352, 41 N. W. 2d 157.

The record shows that the need for the service provided by these trains has been absorbed by other adequate methods of transportation. The little use of the passenger service offered by trains Nos. 21 and 22, as shown by the record, affords most convincing proof of that fact.

The record does show the discontinuance of these two trains will cause some inconvenience to a few persons and businesses. We said, in In re Application of Chicago, B. & Q. R. R. Co., 152 Neb. 367, 41 N. W. 2d 165: "The record shows as we have herein cited that the public makes little use of the passenger service afforded. The discontinuance of the two trains in question will cause inconvenience to a few persons and businesses.

This is not a criterion to be considered, however, when other forms of transportation are available and pre- ferred." And in In re Application of Chicago, B. & Q. R. R. Co., 152 Neb. 352, 41 N. W. 2d 157: "Where some inconvenience would result to a small number of the public by discontinuance of the service of branch line of a railroad, but other services existent and prospec- tive could handle all the business handled by the rail- road with comparatively little extra trouble and addi- tional expense to the public, and the evidence shows that loss in revenue by continuance of the service of passenger trains on a branch line overbalanced inconvenience to public from discontinuance thereof, it is unreasonable and arbitrary for the Nebraska State Railway Commis- sion to deny application for the railroad to discontinue such branch line service."

The record before us conclusively shows that need does not exist for the continued operation of these two trains for the reason that the public prefers and has adopted other methods of transportation and has abandoned the use thereof.

Rule 5.1 of the commission's General Rules of Practice and Procedure provides, in part, as follows: "Any evi- dence which would be admissible in civil actions under the laws of the State of Nebraska shall be admissible in hearings before the Commission. While the Commission is not bound to follow strictly all technical common law rules of evidence, the Commission will require the record in each case to be supported by competent evidence in order to afford parties a full and fair hearing. The rules of evidence shall be applied in any proceeding to the end that needful and proper evidence shall be pro- duced conveniently and speedily, while preserving the substantial rights of the parties."

As to the Interstate Commerce Commission, 49 U. S. C. A., § 20, p. 102, provides that: "The Commission may, in its discretion, for the purpose of enabling it the better to carry out the purposes of this chapter, prescribe a uni-

form system of accounts applicable to any class of carriers subject thereto, and a period of time within which such a class shall have such uniform system of accounts, and the manner in which such accounts shall be kept."

Charles H. O'Hearn, carrier's auditor of capital expenditures, testified that under its system of accounting, as provided by the Interstate Commerce Commission, all costs entering into the production of transportation service are assembled in the accounting department at Chicago in their final form and from such records he had compiled exhibits Nos. 18, 19, and 20 dealing with the revenues and expenses of trains Nos. 21 and 22 during the period from October 1, 1951, to May 9, 1952, and then projected the results thus obtained to an annual estimate. These exhibits show these trains were operated at an annual loss of $36,892. Included in "Out-of-pocket above the rail direct movement expenses" of these trains are certain items of expense computed on an average cost per mile to carrier of equipment of the class used in these trains. This average cost per mile is based on the total actual cost of labor and material necessary for maintaining in serviceable condition all equipment of the carrier of the type used in these trains. The computation is based on a 5-year average, that is, the 5 most recent years for which complete records are available.

The reason given by carrier for using system cost averages is because of its interchange in the use of equipment which, if direct expenses were used, might result in an entirely improper allocation of costs if, for instance, equipment while being used on a particular run should break down and need heavy repairs.

Appellants objected to these exhibits on the ground that they were not the best evidence as carrier's witness acknowledged that generally speaking the records could be made available showing the actual expenses incurred on the equipment used in this service. Appellants also requested the commission to require carrier to produce,

insofar as motor, locomotive, and passenger car repairs were concerned, the original records of its actual expenses for repairs to the particular equipment used in this service during the period which the exhibits cover.

The commission stated this question as follows: "Objections were raised to the receipt in evidence of Exhibits 18, 19 and 20 and ruling thereon was deferred and taken under advisement along with the deferred ruling of protestants' motion requesting a break-down of Exhibit 19 to reflect the expense for motor car, locomotive and passenger car repairs resulting from actual operations within Nebraska rather than on a system-wide basis." It overruled the objections and received the exhibits in evidence.

We said in Bee Publishing Co. v. World Publishing Co., 59 Neb. 713, 82 N. W. 28: "It is elementary * * * that in all judicial proceedings disputed questions of fact must be established by the best means attainable, and that evidence can not be received which indicates on its face that it is secondary and that the original source of information is in existence and accessible."

As stated in 32 C. J. S., Evidence, § 776, p. 701: " 'Best evidence' or 'primary evidence' is that which is the most natural and satisfactory proof of the fact under investigation. All other evidence which in its nature suggests the presence of better evidence is called 'secondary evidence.' "

While the commission has been invested with broad powers within the sphere of duty assigned to it and, in carrying out these duties, is not bound to strictly follow all common law rules of evidence, it should, however, in every instance, require its action to be supported by competent and relevant evidence in order to afford the parties a full and fair hearing.

The following quote from Interstate Commerce Comm. v. Baird, 194 U. S. 25, 24 S. Ct. 563, 48 L. Ed. 860, is here applicable: "The inquiry of a board of the character of the Interstate Commerce Commission should not be

too narrowly constrained by technical rules as to the admissibility of proof. Its function is largely one of investigation and it should not be hampered in making inquiry pertaining to interstate commerce by those narrow rules which prevail in trials at common law where a strict correspondence is required between allegation and proof."

And in Interstate Commerce Comm. v. Louisville & Nashville R. R. Co., 227 U. S. 88, 33 S. Ct. 185, 57 L. Ed. 431, it was stated: "The Commission is an administrative body and, even where it acts in a quasi-judicial capacity, is not limited by the strict rules, as to the admissibility of evidence, which prevail in suits between private parties."

As stated in New York v. United States, 331 U. S. 284, 67 S. Ct. 1207, 91 L. Ed. 1492: "The appraisal of cost figures is itself a task for experts, since these costs involve many estimates and assumptions * * *."

We think the formula followed by the carrier of apportioning motor, locomotive, and passenger car repairs to that class of equipment on a system-wide basis in order to get the average cost per mile for the use thereof is a fairer and more nearly accurate method of allocating such costs to individual operations than to charge to such operations the cost arising directly in connection with its use thereon. The commission here approved that method by overruling appellants' objections to exhibits Nos. 18, 19, and 20 and we can find nothing wrong in the commission's doing so.

Mention is made by appellants of sections 25-12,115 and 25-12,117, R. S. Supp., 1951. We do not think these statutes have application here but, assuming that they do, we think, under the circumstances here shown, that appellee complied therewith by attaching exhibit A to it application.

AFFIRMED.