In re Application of Chicago, Burlington & Quincy Railroad Company for authority to discontinue custodian at Bostwick, Nebraska.
Chicago, Burlington & Quincy Railroad Company, appellant, v. Oswin Keifer et al., appellees.

69 N. W. 2d 541

Filed April 8, 1955. No. 33681.

J. W. *Weingarten* and W. P. *Loomis*, for appellant.

*Robert H. Downing*, for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

SIMMONS, C. J.

The Chicago, Burlington & Quincy Railroad Company made application to the Nebraska State Railway Commission to discontinue the services of a custodian at its Bostwick station. A protest was filed and hearing was had. The commission denied the request. The applicant appealed here. We reverse the order of the commission.

The applicant will be herein referred to as the carrier, and the protestants by that designation.

Bostwick is on the carrier's line between Guide Rock and Superior. It is 6½ miles by rail and 10 miles by graveled highway from Guide Rock, and 6 miles by rail and 7 miles by graveled highway from Superior. The carrier has at the station an industry or side track, and a shelter shed.

It appears that Bostwick was once a thriving business center. Over the years its business establishments have been reduced to an elevator, a one-man repair shop, and the post office. There are from 30 to 35 residents within a radius of half a mile of the shelter shed. Bostwick is now an unincorporated community. Agriculture is the only industry in the surrounding territory.

The carrier maintains normal full-time agencies at Superior and Guide Rock. Agency service was discontinued at Bostwick in 1932. For the period covered by the record here, the carrier had had custodial service

only, at this station for 1¾ hours a day. This was divided between periods when the trains arrive. The custodian unlocks the shelter house at train time and, when required, maintains a fire for warmth there. The postmaster uses the shelter house on occasion when waiting for the mail trains. No one else is shown to have used it. On occasions, the custodian gets train information for the postmaster by carrier telephone so that he may return to the post office, 3 blocks away, if the train is late. Custodial service is a convenience to the postmaster in that regard. The custodian has no duties with reference to the mail.

The custodian has the duty of loading and unloading cream cans if cream is shipped as baggage. For 32 months prior to the hearing, no cream was shipped nor empties returned at this station. If there should be such business in the future and if the custodian is removed, this service would be rendered by train crews.

It is not clear what the custodian has to do with less-than-carload shipments of freight forwarded from this station. The paucity of the record in that regard is probably explained by the fact that in the 32-month period prior to the hearing there was one shipment of 30 pounds in that classification.

The custodian receives and delivers less-than-carload shipments of freight received at the station. The deliveries are made when he is on duty, or at other times for accommodation to consignees. In the 32-month period mentioned, there were 65 shipments received. During the last 8 months there were 3 months in which no shipments were received, and a total of 9 such shipments were received in that 8-month period.

If the custodian is removed, service on this class of freight will be available at either Guide Rock or at Superior. It can be delivered at Bostwick and placed in the shelter shed by train crews at consignee's risk if so desired.

Apparently the express business at the station is

handled for the express company by the custodian. The amount of such business, in number of shipments handled, is not shown. However, for the 32-month period the carrier's revenue from that source at the station was $131.51. For comparison, the less-than-carload freight revenue allocated on the basis of 50 percent to the originating and delivering station was $77.05. It appears that express service is available at Guide Rock and Superior the same as for freight.

The cost of the custodial service at the station is shown to be $1,168.94 for the 32-month period.

There were four witnesses for the protestants. One was the postmaster who desired the convenience of the shelter house and the train information. That is not shown to be revenue-producing business for the carrier.

Two protestants were nearby farm residents who desired the convenience of available less-than-carload freight service, but neither appears to have used it to any extent of late years. The principal protestant, a nearby farmer, appears to have been the principal user of less-than-carload shipments. He desired that it be kept available for the limited use that he makes of it, and to prevent a further dissolution of the business community. These protestants show that their business centers are now either Guide Rock or Superior. The business community as such has all but disappeared. The principal protestant seeks to avoid this one further removal of a business activity.

The protestants likewise present the fact that surrounding farm lands are now being developed by irrigation. They anticipate increased business from that source for the carrier.

We do not deem it necessary to recite the showing made as to carload shipments or passenger service. It is shown that it will not be affected by either the retention or removal of the custodian. In Thomson v. Nebraska State Railway Commission, 142 Neb. 477, 6 N. W. 2d 607, we said: "* * * assuming that the station is

highly profitable to the carrier we know of no rule of law or reason which requires the expenditure of earnings from a particular community in that community contrary to the requirements of reasonable service. We, however, do not so assume and we cannot so conclude from the evidence adduced."

We have heretofore stated the rules of law applicable to the situation presented by this record: "The services and facilities to be furnished by a railroad company at any station need only be just, reasonable, and adequate to the requirements of the station, and should in a measure be commensurate with the patronage and receipts from that portion of the public to whom such service is rendered. * * *" In re Application of Union P. R. R. Co., 149 Neb. 575, 31 N. W. 2d 552. "In the final analysis, when an application is made for additional service or to discontinue an existing service, the question to be determined is the public need or lack of need therefor. * * * the carrier is not required to maintain standby station agency service not comprehensively used by the public, or to be used only when other established carriers fail to meet the need." Chicago, B. & Q. R. R. Co. v. Order of Railroad Telegraphers, 155 Neb. 387, 52 N. W. 2d 238. "It is the duty of a carrier to seek, and of regulatory agencies to permit, the elimination of those services and facilities that are no longer needed or used by the public to any substantial extent." Chicago & N. W. Ry. Co. v. City of Norfolk, 157 Neb. 594, 60 N. W. 2d 662.

It is patent that the services performed by a custodian at this station are no longer needed or used by the public to any substantial extent. The record indicates that the discontinuance of custodial service may cause inconvenience to one consignee of less-than-carload freight. However, his evidence shows that the service at Superior and Guide Rock is adequate and available without undue expense of time or money. A carrier by rail, under these circumstances, is not obligated to furnish sub-

stantially door-to-door delivery of commodities which are shipped over its lines.

There remains the contention that irrigation development will bring additional transportation requirements. Whether it does or not is purely speculative. Likewise, it is speculative whether it will require the increase of facilities or services at Bostwick or follow existing trade practices and be made upon facilities at Guide Rock and Superior.

As to that question, the rule is: "The ruling of the railway commission or of this court on the question of discontinuance of an agency at any given time does not amount to an adjudication for the future. It is only a judgment on the condition presented by the application and relates only to the time and conditions presented." Thomson v. Nebraska State Railway Commission, *supra.*

Finally, the rule is: "On appeal to the Supreme Court from an order of the Nebraska State Railway Commission, while acting within its jurisdiction, the question for determination is the sufficiency of the evidence to prove that the order is not unreasonable or arbitrary." Chicago & N. W. Ry Co. v. City of Norfolk, *supra.*

This record presents the almost irreducible minimum of the use of custodial service by the public at Bostwick. The order denying the application was arbitrary, unreasonable, and contrary to the established law of this state. Clearly the application should have been granted.

The order of the Nebraska State Railway Commission is accordingly reversed.

REVERSED.