IN RE APPLICATION OF CHICAGO AND NORTH WESTERN RAILWAY COMPANY.

CHICAGO AND NORTH WESTERN RAILWAY COMPANY, APPELLANT, v. SAVE THE TRAINS ASSOCIATION, APPELLEE.

91 N. W. 2d 312

Filed July 3, 1958. No. 34430.

*Neely, Otis & Neely, Carl McGowan,* and *Edgar Vanneman, Jr.,* for appellant.

*Viren, Emmert, Hilmes & Gunderson,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, WENKE, and BOSLAUGH, JJ.

CARTER, J.

The Chicago and North Western Railway Company commenced this proceeding before the Nebraska State Railway Commission to secure permission to discontinue passenger trains Nos. 13 and 14 which operate daily between Omaha and Chadron. Objections were filed by the Save the Trains Association. The commission, after a public hearing, granted the application. The commission thereafter granted a rehearing. The railway company has appealed from the order granting a rehearing, contending that such order was arbitrary and unreasonable.

The railway company filed its application with the commission on August 15, 1956. The hearing on the application was held by the commission at Valentine, Nebraska, on July 29 through August 2, 1957. On February 7, 1958, the commission entered its findings of fact and ordered the trains discontinued as of March 15, 1958. A motion for a rehearing was filed on February 17, 1958. On March 7, 1958, the commission entered an order granting a rehearing, ordered the continued operation of the trains, and indicated that further hearings would be held at an undetermined date in the future. It is from the latter order that this appeal was taken.

The record made in this case is very voluminous, but the controlling facts are comparatively simple. The railway company shows a net loss of $5,529,000 in 1956. In 1955 it had a net income of $1,506,000. In 1954 it had a net loss of $5,249,000. Its freight revenues have been consistently good since 1951, while the operation of passenger trains has been at a progressively greater loss since 1952. The over-all picture demonstrates that freight operations have been carrying the losses in passenger operations. The evidence shows that a change in the management of the railway company was made on April 1, 1956, for the purpose of eliminating the losses that had been incurred. One of the primary purposes of the new management was to eliminate as many of the sources of loss as possible, including the elimination of passenger trains which were being operated at great loss to the company. Trains Nos. 13 and 14 are two that have been extremely costly to the railway company. For the year 1956 the loss sustained by the operation of these two trains over and above revenues was in excess of $227,000. The witness Larry S. Provo, vice president and comptroller of the railway company, estimated the actual loss in operating these trains at $750,000 to $1,000,000 per year. The out-of-pocket loss which is savable to the railway company is in excess of $623 per day.

There is evidence that some users will be inconven-

ienced by the removal of these trains from service. By and large, the evidence deals with freight service, the necessity for adequate service in moving grain, livestock, and other similar commodities. The application is for the removal of two passenger trains, and in no way interferes with the handling of freight by the railroad. It is argued that mail service will be seriously affected by the elimination of these trains. The carrying of mail is not a common-carrier function of the railroads and inconvenience with reference to it is not material to the issues. Chicago, R. I. & P. R. R. Co. v. Farmers Union Creamery, 166 Neb. 32, 87 N. W. 2d 616. It is contended that the trains are needed for the handling of express and baggage. The record does show that shipments of cream are quite heavy at times on these trains. The evidence shows that other forms of transportation are available for the movement of such commodities. Numerous truck lines operate throughout the area which have adequate facilities for the movement of such products. It is clear from the record that adequate means are available to adequately serve the communities in this respect after the discontinuance of trains Nos. 13 and 14.

It is the public necessity as distinguished from local convenience that affords the primary consideration in determining if trains operated at great loss may be discontinued. Chicago, R. I. & P. R. R. Co. v. Farmers Union Creamery, *supra*. There is a general duty imposed upon railroads to provide service when such service is necessitous. But where such public necessity does not exist, and adequate service can be had from other forms of transportation, it is the duty of the railway company to seek and the commission to approve the elimination of such unneeded and costly service. In re Application of Chicago, B. & Q. R. R. Co., 152 Neb. 352, 41 N. W. 2d 157; Chicago & N. W. Ry. Co. v. City of Norfolk, 157 Neb. 594, 60 N. W. 2d 662; Chicago, B. & Q. R. R. Co. v. Burgess, 166 Neb. 29, 87 N. W. 2d 630.

The purpose of commission control of railroads is to

secure adequate, sustained service for the public at a minimum cost. The commission is not in the position of an owner. It has a duty to the railroads as well as to the public. It must protect and conserve the investments in the railroads and insure a reasonable return to railroads that are efficiently maintained and operated. But where, as the evidence in this case demonstrates, passenger trains are operated at great loss due to a large decrease in passenger traffic, and no real public need exists for their continuance, the railway company is entitled to an order discontinuing such trains. The evidence shows that the wages of the train crews exceed by two and one-half times the passenger revenues derived from the passenger service here involved. The operation of these trains has become a drain upon the other sources of revenue by the company. The financial structure of the company has become so precarious that necessary repairs and maintenance of track, trains, and equipment has been delayed for such a period of time that their unsatisfactory condition can no longer be ignored.

The record shows that the railway company and the association, during 1954 and 1955, cooperated in an effort to increase the revenues from these two trains to avoid the necessity of their discontinuance. Additional losses occurred irrespective of these efforts. In its order of February 7, 1958, the commission stated: "Without question, there never was a more intent, sustained or lengthy campaign to divert business back to the railroad than was engaged in by all concerned than in the instant matter, but the fact is that the loss kept growing larger and larger." The evidence sustains this conclusion.

The evidence clearly demonstrates that we are in a period of economic change insofar as the transportation industry is concerned. This is particularly true of railroad passenger service. The utility of the automobile makes it much more convenient than local passenger

service. As the number of automobiles increases, passenger service on the railroads correspondingly decreases. Buses, trucks, and airplanes are contributing to the losses of the railroads in the operation of passenger trains. The elimination of branch-line passenger trains and a reduction in mainline passenger service appear certain because of the desire of the public to use other forms of transportation. The change is consistent with the desires of the public which will not be prevented or stayed by the orders of regulatory commissions. A failure to recognize the existing situation can only result in costly operations and great losses in railroad investments.

The record in this case conclusively sustains the findings of the commission in its order of February 7, 1958, authorizing the discontinuance of trains Nos. 13 and 14 as of March 15, 1958.

On February 17, 1958, the Save the Trains Association filed a motion for a rehearing. On March 7, 1958, a rehearing was granted and trains Nos. 13 and 14 ordered continued in service. No additional evidence was produced in support of the motion for a rehearing. The reasons given by the commission in its order were that progress was being made by the new management of the railway company in improving its financial structure and that the results of operations during the first 6 months of 1958 should be examined before a final determination of the issues was made. There was nothing to indicate that the public had any greater need for the trains than before. The reasons for granting the rehearing were either specious or based on pure speculation and conjecture.

We point out that the application was filed on August 15, 1956. For 2 years prior thereto every effort had been made by the parties to put these trains on a paying basis without success. The application was pending from August 15, 1956, to February 7, 1958, a period of almost 18 months before the commission entered its order. This unreasonable delay, and the losses sustained by the

railroad as a result thereof, is for all practicable purposes a taking of its property without due process of law. In Ann Arbor R. R. Co. v. Michigan Public Service Commission, 91 F. Supp. 668, the court aptly stated this principle in the following language: "Where there is no public necessity present, an order compelling the plaintiff to operate its trains under the circumstances of this case and under the conditions set out by the defendant Commission, is arbitrary and unreasonable, and carries with it the confiscation of the plaintiff's property without compensation, and denies to the plaintiff the equal protection of the laws, in violation of the Constitution of the United States." In Chicago, B. & Q. R. R. Co. v. Illinois Commerce Commission, 82 F. Supp. 368, the court commented on a similar situation in the following language: "The Illinois Commerce Commission's custom and practice of substituting a sham, for a fair, hearing by the device of granting repeated continuances for frivolous reasons with the result that an average of 18 months is required to hear and decide train-discontinuance cases that ought to be heard in 3 days and decided within 30 days thereafter involves an illegal and arbitrary dissipation of plaintiff's public utility assets in violation of plaintiff's rights under the 14th Amendment of the United States Constitution, in disregard of said Commission's obligation under the Illinois Public Utilities Act, in disregard of the policy of economical railroad operation enjoined by Congress in the Transportation Act and to the damage of the larger public interest."

But irrespective of the conclusiveness of the evidence, the commission has compelled the continued operation of these trains. When this appeal was taken the case stood in the same position as when the application for the removal of the trains was filed on August 15, 1956. The procrastination and delay on the part of the commission has resulted in a minimum loss of $623 per day since March 15, 1958. The only justification attempted is an expressed dissatisfaction with the evidence, although the

evidence on the material issues stands wholly uncontradicted. In Smith v. Illinois Bell Telephone Co., 270 U. S. 587, 46 S. Ct. 408, 70 L. Ed. 747, the Supreme Court of the United States discussed a similar situation as follows: "For this apparent neglect on the part of the commission, no reason or excuse has been given; and it is just to say that, without explanation, its conduct evinces an entire lack of that acute appreciation of justice which should characterize a tribunal charged with the delicate and important duty of regulating the rates of a public utility with fairness to its patrons, but with a hand quick to preserve it from confiscation. Property may be as effectively taken by a long-continued and unreasonable delay in putting an end to confiscatory rates as by an express affirmance of them; and where, in that respect, such a state of facts is disclosed as we have here, the injured public service company is not required indefinitely to await a decision of the rate-making tribunal before applying to a federal court for equitable relief. The facts, which the motion to dismiss conceded, present a far stronger case for such relief than any of the cases with which this court dealt in Okla. Gas Co. v. Russell, 261 U. S. 290, 293; Prendergast v. N. Y. Tel. Co., 262 U. S. 43, 49; Pacific Tel. Co. v. Kuykendall, supra, p. 204; and Banton v. Belt Line Ry., 268 U. S. 413, 415."

A railroad company is not required to prove its case with mathematical precision in requesting permission to remove a passenger train from service. In Baltimore & O. R. R. Co. v. United States, 298 U. S. 349, 56 S. Ct. 797, 80 L. Ed. 1209, the court described the nature of the evidence required as follows: "The burden on appellants, heavy though it is, does not require them to prove with arithmetical accuracy the cost of the transportation covered by the challenged divisions or the value of the property used to perform it, or the proportion attributable to that service. It is enough, if the evidence preponderating in their favor reasonably warrants findings sufficient to support the decree sought. Many is-

sues as to which demonstrable accuracy is impossible have to be decided by the courts. In ascertaining cost of transportation of one out of many commodities hauled by railroads it is impossible to attain precision. Mere lack of it is not ground for objection either to the evidence offered or the facts which it tends to prove." The commission is bound to follow the evidence where no substantial conflict exists. It may not make arbitrary orders based on the aspirations of communities for the best railroad passenger service, or for standby service for modes of transportation generally used, or to satisfy the demands of employees that existing jobs be continued. As we have many times said, public need constitutes the main issue, and where such need is not shown, a railway company will not be required to uneconomically operate trains and thereby deplete its assets and reduce the quality of other services it is compelled to render.

It is argued by the appellee that the Nebraska State Railway Commission has the sole power to decide applications seeking the discontinuance of trains in passenger service, and that this court is without power to regulate common carriers. This is a correct statement of the law.

When the people of this state entrusted the regulation of public utilities to the railway commission, they did not grant it a power that could be whimsically exercised. It was power that was to be exercised with reasonable promptness under law with a due regard to established facts. The exercise of power by the commission without a proper application of the law to established facts is an arbitrary exercise of power which the courts cannot condone. The fact that the regulation of public utilities was placed with a commission having some attributes of legislative, executive, and judicial authority does not clothe it with an indiscriminate discretion in the handling of its business. Its discretion is a legal one. If this were not so it could well give rise to an administrative tyranny over common carriers and public utilities similar

to that suggested in In re Application of Airline Ground Service, Inc., 151 Neb. 837, 39 N. W. 2d 809.

It is urged that the order of the commission appealed from is not a final order. The case is properly before the court on the authority of In re Application of Airline Ground Service, Inc., *supra*.

We conclude that the order of the commission granting a rehearing was arbitrary and unreasonable. The commission's order of March 7, 1958, granting a rehearing is reversed, leaving in effect the order of February 7, 1958.

REVERSED.