IN RE APPLICATION OF CHICAGO, ROCK ISLAND & PACIFIC RAILROAD COMPANY ET AL.
CHICAGO, ROCK ISLAND & PACIFIC RAILROAD COMPANY ET AL., APPELLEES, v. HEBRON CHAMBER OF COMMERCE ET AL., APPELLANTS.
101 N. W. 2d 448

Filed March 4, 1960. No. 34723.

*Leonard J. Germer* and *W. O. Baldwin*, for appellants.

*Chambers, Holland, Dudgeon & Hastings*, for appellees.

Heard before CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

WENKE, J.

This is an appeal from an order of the Nebraska State Railway Commission granting the Chicago, Rock Island & Pacific Railroad Company and the Railway Express Agency authority to discontinue the agency at Hebron, Nebraska, and to retire the depot.

The Chicago, Rock Island & Pacific Railroad Company and the Railway Express Agency filed their joint application with the Nebraska State Railway Commission on January 6, 1958, for the purpose of obtaining the authority granted them. The Hebron Chamber of Commerce, consisting of some 87 business men of Hebron, and the Hebron Industrial Development Corporation, a corporation organized by some 90 professional and business men of Hebron to bring new business to that city, filed their written protest to the application and were represented by counsel at a public hearing held thereon on March 12, 1958, at the courthouse in Hebron. Although the hearing was held on March 12, 1958, the commission did not act on the application until June 12, 1959, a year and 3 months later, when it granted the applicants the authority which they sought. There is no reason shown for this delay. The protestants thereupon filed a motion for rehearing and have taken this appeal from the overruling thereof.

We shall herein refer to the Chicago, Rock Island & Pacific Railroad Company as the Rock Island; to Railway Express Agency as the Express Agency; and to the

Nebraska State Railway Commission as the commission.

We have often stated the rule applicable on appeal from an order of the commission as follows: "On appeal to the Supreme Court from an order of the Nebraska State Railway Commission, while acting within its jurisdiction, the question for determination is whether or not the order is arbitrary and unreasonable." Chicago & N. W. Ry. Co. v. Save the Trains Assn., 167 Neb. 61, 91 N. W. 2d 312. See, also, Skeedee Independent Tel. Co. v. Farm Bureau, 166 Neb. 49, 87 N. W. 2d 715; Chicago, B. & Q. R. R. Co. v. Keifer, 160 Neb. 168, 69 N. W. 2d 541; In re Application of Chicago, B. & Q. R. R. Co., 152 Neb. 367, 41 N. W. 2d 165; In re Application of Union P. R. R. Co., 149 Neb. 575, 31 N. W. 2d 552; Thomson v. Nebraska State Railway Commission, 143 Neb. 52, 8 N. W. 2d 552.

Hebron is the county seat of Thayer County and has a population of some 2,000 inhabitants. It is serviced by two railroads, the Burlington and the Rock Island. The Rock Island runs a branch line from Fairbury, Nebraska, on its main line to Ruskin, Nebraska. The city of Hebron is located on this branch line. A mixed train is now being operated over this branch line from Fairbury to Ruskin and return on 3 days of each week, that is, Monday, Wednesday, and Friday. However, very few passengers ride this train as only two tickets were sold by the agent in Hebron in 1957, for a total revenue of 75 cents. This train hauls only carload shipments, for all L. C. L. (less than carload) shipments handled by the Rock Island are transported by motor trucks operated by the Rock Island Motor Transit Company, a subsidiary. It should be noted that the application does not seek to have any of these transportation services discontinued nor does the order of the commission so authorize. It is only the convenience of securing some of these transportation services by the people of Hebron through the service of an agent located in a depot at that point that is of concern here,

for it is the plan of the Rock Island to have its agent at Deshler, which is some 9 miles from Hebron, perform the duties now being performed by its agent at Hebron.

The present agent at Hebron is on a 5-day, 40-hour week, Monday through Friday. A survey of his position shows that he is actually busy about 2 hours and 40 minutes of each day, of which 1 hour and 20 minutes are consumed in maintenance (housekeeping) work. This leaves a maximum of about 1 hour and 20 minutes of work that would be transferred to the agent at Deshler if the change is made. A survey of the agent's work at Deshler, who is also on a 5-day, 40-hour week, Monday through Friday, shows that he is actually busy about 5 hours a day, thus he will not be overburdened by the transfer of this work to his position. The average cost to the Rock Island in 1955, 1956, and 1957 for operating its depot and maintaining an agent at Hebron was in excess of $5,000 a year. This will be covered in more detail hereinafter.

As we said in Chicago & N. W. Ry. Co. v. Save the Trains Assn., *supra:* "The purpose of commission control of railroads is to secure adequate, sustained service for the public at a minimum cost. The commission is not in the position of an owner. It has a duty to the railroads as well as to the public. It must protect and conserve the investments in the railroads and insure a reasonable return to railroads that are efficiently maintained and operated." See, also, In re Application of Chicago, B. & Q. R. R. Co., *supra;* In re Application of Union P. R. R. Co., *supra;* Thomson v. Nebraska State Railway Commission, *supra.*

In this respect we said in Chicago, B. & Q. R. R. Co. v. Keifer, *supra:* "It is the duty of a carrier to seek, and of regulatory agencies to permit, the elimination of those services and facilities that are no longer needed or used by the public to any substantial extent." See,

also, In re Application of Chicago, B. & Q. R. R. Co., *supra.*

When an application is made to discontinue an existing service or facility the issue presented is primarily to be determined by the public need or lack of need therefor, as distinguished from local convenience, for there is a general duty imposed upon railroads to provide those services to the public for which there is public need. In deciding such issue the cost of providing the service in comparison to the revenue derived therefrom are important elements to be considered although not necessarily controlling thereof. See, Chicago & N. W. Ry. Co. v. Save the Trains Assn., *supra;* Chicago, B. & Q. R. R. Co. v. Keifer, *supra;* Chicago, B. & Q. R. R. Co. v. Order of Railroad Telegraphers, 155 Neb. 387, 52 N. W. 2d 238; In re Application of Chicago, B. & Q. R. R. Co., *supra;* In re Application of Chicago, B. & Q. R. R. Co., 152 Neb. 352, 41 N. W. 2d 157.

However, as stated in Thomson v. Nebraska State Railway Commission, *supra:* "* * * when the duty sought (to be discontinued) is convenience rather than necessity the questions of expense to the company, the volume of business done, service required in meeting community needs, revenue returned therefrom, and relative benefit to the public served, are factors which cannot be disregarded."

As stated in In re Application of Union P. R. R. Co., *supra,* by quoting from Chicago, R. I. & P. Ry. Co. v. Nebraska State Railway Commission, 85 Neb. 818, 124 N. W. 477, 26 L. R. A. N. S. 444: "* * * unless public necessity requires, the discretion of the railroad company in establishing and maintaining its stations should not be interfered with." See, also, Chicago, B. & Q. R. R. Co. v. Keifer, *supra.*

We said in Thomson v. Nebraska State Railway Commission, *supra:* "The facilities and services to be furnished by a railroad company at any station need only be just, reasonable and adequate to the requirements of

the station, and should in a measure be commensurate with the patronage and receipts from that portion of the public to whom such service is rendered. The need for agency service should not be measured by financial results alone, but should be measured also by the agent's usefulness to the company as well as to the public."

In Chicago, B. & Q. R. R. Co. v. Keifer, *supra*, we said: "A carrier is not required to make expenditure of earnings, from a particular community in the community where earned, in excess of the requirements of reasonable service."

"The matter of time necessary to be devoted to the performance of duties by an agent of a railroad is a matter of importance in determining whether or not the railway commission acted arbitrarily and unreasonably in denying an application for the discontinuance of an agency." In re Application of Union P. R. R. Co., *supra*.

After analyzing the evidence adduced in detail the commission found that there was no public need for an agent at Hebron and, based thereon, authorized the agency to be discontinued and the depot to be retired. The evidence is correctly analyzed by the commission and fully supports its order; however, we shall herein set forth some of the salient features thereof.

As we have already stated none of the transportation facilities and services for hauling carload and L. C. L. shipments to and from Hebron by the Rock Island will, in any respect, be curtailed by the granting of the order. There will be some changes in the method of handling shipments which, in some instances, will cause some inconvenience to a small number of the public using such facilities and services while, in other instances, they will provide better service.

The accounting method used by the Rock Island for assigning revenue and system operating costs is sufficiently realistic and practical for the purpose for which it is intended. See Chicago & N. W. Ry. Co. v. Save

the Trains Assn., *supra*. System operating costs are ascertained by taking all of the expenses of the Rock Island for any 1 year and deducting therefrom the direct amounts expended by it for station employees and station maintenance over the entire system. Using this method the system operating costs in 1955 were 69.97 percent of revenue received; in 1956, 70.98 percent of revenue received; and in 1957, 72.51 percent of revenue received. These are the 3 full calendar years immediately preceding the hearing on March 12, 1958. By using the accounting methods that it did the Rock Island assigned $13,530.33 of revenue to Hebron for the year 1955; $7,131.97 for the year 1956; and $17,573.18 for the year 1957. These totals included its carload operations at Gilead, Nebraska, which were handled through the agent at Hebron as the Rock Island has neither a station nor agent at Gilead. The Rock Island also assigned $9,467.17 of its system operating expenses to Hebron for the year 1955; $5,062.27 for the year 1956; and $12,742.31 for the year 1957. These sums, when taken together with the actual direct operating expenses had by the Rock Island in connection with maintaining its depot and agent at Hebron in the year 1955 of $4,715.26; in 1956 of $5,189.10; and in 1957 of $5,579.24, left a net loss for that station in the sum of $652.10 for 1955; $3,119.40 for 1956; and $748.37 for 1957. These losses would be much higher if the revenue received from the business done at Gilead was not included in that assigned to Hebron. It will be observed that the average cost of maintaining a depot and agent at Hebron, which could be saved if the order of the commission is affirmed, is $5,161.20 per year.

We shall hereinafter discuss the effect of the changes authorized by the commission's order on the situation as it presently exists.

Insofar as the carload shipments being sent from or received at Gilead are concerned, there being 120 carloads sent and 9 received in the 3-year period from

1955 through 1957, it would appear they could be handled through the agent at Deshler as well as is now being done through the agent at Hebron. No real inconvenience would result to the users of the transportation facilities and services of the Rock Island at Gilead.

During these same 3 years there were 173 carloads received and 61 sent from Hebron, or an average of 4.8 plus received and 1.7 minus carloads sent per month. The incoming carloads will, with very few exceptions, be handled the same as they are now, that is, set out at a proper place for the consignee thereof to unload as most inbound carloads are prepaid. The same would be true even if such carload shipment is not prepaid if the consignee is on the approved credit list of the Rock Island or has given it a bond to cover the payment of the freight, for then the car would be set out for unloading and the consignee billed for the freight. If that is not done, then, if the freight is not prepaid, the consignee will have to get in touch with the agent at Deshler for the car, together with the way bill, would be carried through Hebron to that point. However, if the consignee gets in touch with the agent at Deshler immediately and pays the freight then the car could be returned to Hebron on the same day and set out, thus causing very little delay or inconvenience. If a carload shipment arrives on a shipper's order it would be carried through to Deshler and the consignee would have to get the bill of lading from the bank, take it to the agent at Deshler, and pay the freight before the car could be set out for unloading. However, the division superintendent testified he is not aware of a carload ever having been received at Hebron on a shipper's order.

Shippers of carload lots out of Hebron would have to call the agent at Deshler instead of the agent at Hebron to get a car spotted for loading. This could be done at the expense of the Rock Island. When loaded the shipper can either fill out a bill of lading

and send it by motor truck to the agent at Deshler or he can have the agent at Deshler fill it out and sign it and, in either situation, it can then be mailed to the consignee, or any other person designated by the shipper, with a copy to the latter. This would be a little more inconvenient than at present but nothing of any serious nature. We think that the shippers and consignees of carload shipments would be put to very little inconvenience if the change was made and certainly all the transportation services that are now available to them would still be available.

At present incoming L. C. L. shipments, when they arrive in Hebron by truck, are taken to the depot and left there. They are then delivered to the consignee by dray. If the change is made the truck, instead of taking incoming L. C. L. shipments to the depot, will deliver them directly to the consignee. This should result in some benefit to those receiving L. C. L. shipments. During the past 3 years these have averaged about 22 per month. If a shipment coming in is not prepaid then similar arrangements for its delivery to the consignee will have to be made as in case of carload shipments. For those frequently receiving shipments that are not prepaid, this can be done by getting on the approved credit list of the Rock Island or by putting up a bond with it to cover such charges. During this same period of time about 10 L. C. L. shipments per month were made from Hebron. This presents a somewhat more difficult situation for the shipper if he wishes to send the shipment prepaid. If he does not he can call the agent at Deshler and have it picked up. Major shippers of L. C. L. shipments could make arrangements to send their shipments prepaid without going to Deshler by getting on the approved credit list or by putting up a bond, but there undoubtedly will be a small number of individuals who make only an occasional shipment who would have to go to Deshler

to send such a shipment prepaid. Deshler is 9 miles from Hebron.

The agent of the Rock Island has been handling the Express Agency's business for a commission of 10 percent of the charges made on both outgoing and incoming express. This commission is in addition to his regular salary as agent and is not paid by the Rock Island. The express is presently carried by motor trucks of the Rock Island Motor Transit Company and delivered to and picked up from the depot in Hebron. If the present order of the commission is affirmed it is the intention of the Express Agency to get some other agent in Hebron to handle its business there. If it can, it will be handled by these motor trucks in the same manner as L. C. L. shipments and there would be no change in the service. If the Express Agency cannot get someone to handle its business in Hebron then it will be handled through the agent of the Rock Island in Deshler.

As to passenger traffic, there were 14 tickets sold in Hebron in 1955; 9 in 1956; and 2 in 1957. Thus it becomes evident that no inconvenience will result to the public of Hebron in this area. United States mail is already being carried by a Star Route System, so it cannot be affected by the change. The agent at Hebron receives calls for Western Union and transmits them by telephone to the agent at Superior, Nebraska, for Western Union has no wire service at Hebron. For this service he gets a commission which is in addition to his regular salary as agent. No inconvenience will result to the public of Hebron, for if any of them need the services of Western Union they can call the agent at Superior as well as the agent at Hebron. There will also be some inconvenience in handling claims for damages to incoming shipments, both carload and L. C. L. Now they are handled through the agent at Hebron and, if the change is made, they will be handled through the agent at Deshler. This will cause a slight but insigni-

ficant delay. However, there were only 11 claims made in 1957.

There are other minor matters touched on by the witnesses but which we do not feel have sufficient importance to warrant their discussion. We have touched on the principal service rendered to Hebron by the Rock Island and the Express Agency and, to a certain extent, outlined the effect on the public's use of these services and the inconvenience, if any, that they may or will suffer by reason of the change authorized. We do not set out all of the details in relation thereto because, to do so, would greatly lengthen this opinion without serving any useful purpose. We do think, as the commission held, that the inconveniences, if any, that may be experienced by the public of the city of Hebron and the surrounding territory in using the transportation facilities and services of the Rock Island and the Express Agency do not justify requiring the Rock Island to expend in excess of $5,000 per year to avoid them. In view thereof we do not find the order of the commission to be either unreasonable or arbitrary, and therefore affirm its order granting the authority requested by the Rock Island and the Express Agency.

In view of certain statements made by the appellants' counsel we quote the following from Chicago, B. & Q. R. R. Co. v. Keifer, *supra:* "The ruling of the Nebraska State Railway Commission or of this court on the question of discontinuance of an agency at any given time does not amount to an adjudication for the future. It is only a judgment on the condition presented by the application and relates only to the time and conditions presented." See, also, In re Application of Union P. R. R. Co., *supra;* Thomson v. Nebraska State Railway Commission, *supra.*

AFFIRMED.