IN RE APPLICATION OF CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY.
CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, APPELLEE, V. CITY OF ALLIANCE ET AL., APPELLANTS, IMPLEADED WITH CITY OF RAVENNA ET AL., APPELLEES.
89 N. W. 2d 837

Filed May 2, 1958. No. 34361.

*Reddish & Reddish* and *Glen A. Fiebig,* for appellants.

*J. W. Weingarten* and *W. P. Loomis,* for appellee Chicago, B. & Q. R. R. Co.

*Clark J. Mingus, John H. Evans,* and *Tedd C. Huston,* for appellees City of Ravenna et al.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

The Chicago, Burlington & Quincy Railroad Company, hereinafter called plaintiff, commenced this proceeding before the Nebraska State Railway Commission, hereinafter called the commission, seeking permission to discontinue Sunday operations of passenger trains 41 and 44 between Lincoln and Alliance. Objections thereto were filed by the city of Alliance and others, hereinafter called defendants.

After two public hearings, the commission granted plaintiff's application and subsequently overruled defendants' motion for rehearing and stay of the commission's order. Therefrom defendants appealed, assigning in substance: (1) That the commission erred by receiving in evidence, over objections, exhibits Nos. 6, 6A, 10, and 10A, which presented for consideration plaintiff's revenue, expenses, and net loss from operation of the trains; (2) that the commission erred in failing to

make a timely and appropriate ruling upon defendant's motions numbered 1 through 8, filed by defendants on May 10, 1957; and (3) that the decision and order of the commission was unreasonable and arbitrary. We conclude that the assignments should not be sustained.

Preliminary to a consideration of defendants' assignments and the record upon the merits, we call attention to recent applicable and controlling authorities from this jurisdiction. In Chicago & N. W. Ry. Co. v. City of Norfolk, 157 Neb. 594, 60 N. W. 2d 662, citing numerous authorities, we held: "It is the duty of a carrier to seek, and of regulatory agencies to permit, the elimination of those services and facilities that are no longer needed or used by the public to any substantial extent.

"In the final analysis, when an application is made for additional service or to discontinue an existing service, the question to be determined is the public need or lack of need therefor.

"A final order of the Nebraska State Railway Commission granting a railroad company authority to discontinue specified passenger trains, operated within the state at a loss and for the operation of which no public need exists, is within the scope of its authority and not arbitrary and unreasonable.

"On appeal to the Supreme Court from an order of the Nebraska State Railway Commission, while acting within its jurisdiction, the question for determination is the sufficiency of the evidence to prove that the order is not unreasonable or arbitrary." See, also, Chicago, B. & Q. R. R. Co. v. Burgess, *ante* p. 29, 87 N. W. 2d 630; Chicago, R. I. & P. R. R. Co. v. Farmers Union Creamery, *ante* p. 32, 87 N. W. 2d 616.

The opinion in Chicago & N. W. Ry. Co. v. City of Norfolk, *supra,* also adversely disposes of defendants' first assignment, the substance of which was to contend that the commission erred by receiving in evidence, over objections, exhibits Nos. 6, 6A, 10, and 10A, which set forth at length plaintiff's theory of allocation of

revenues, cost of operation, and net loss from operation of trains 41 and 44 on Sundays in December 1955 to August 1956, inclusive, and in September 1956 to April 1957, inclusive, and for April 1956 and March 1957.

In that connection, to quote at length from that opinion would serve no useful purpose. If the commission did not err prejudicially in the admission of such evidence, and we conclude that it did not, then defendants' second assignment of error should not be sustained. In such respect, on May 10, 1957, prior to a second hearing timely ordered and noticed to be held on May 20, 1957, defendants filed motions numbered 1 through 8, inclusive, requesting a continuance and an order for the production by plaintiff of a great mass of detailed original records, most of which were kept in Chicago, Illinois, by which defendants hoped to show that the undisputed loss of operation by plaintiff was less than that shown by plaintiff's exhibits aforesaid and evidence in support thereof. It appears that although defendants had ample time and opportunity to file such motions and to have them heard and disposed of before May 20, 1957, they did not do so. Rather, defendants waited until the commission convened for rehearing on the merits May 20, 1957, and after defendants had filed an answer on that date, at which time they requested a ruling on the motions. Thereupon the commission overruled the motions and proceeded with the hearing without objection by defendants. Also, at that time, defendants joined in plaintiff's request that all the evidence and exhibits, including Nos. 6 and 10, which had been received at the first hearing on September 19, 1956, should be received in evidence, and pursuant thereto such evidence was offered by plaintiff and received as part of the record of the proceedings in the second hearing on May 20, 1957. We conclude not only that defendants' assignment has no merit, but also that defendants are in no position to complain with regard thereto.

In connection with defendants' third assignment of

error relating to the merits, we have examined the voluminous record, which, as far as important here, discloses substantially the following: Trains 41 and 44 operated daily, including Sundays, between Lincoln and Alliance, a distance of 366 miles. Train 41 was scheduled to leave Lincoln at 7 p. m. and arrive in Alliance at 4 a. m. Train 44 was scheduled to leave Alliance at 11 a. m. and arrive in Lincoln at 8 p. m. They also made certain interchange connections with other trains operated by plaintiff.

Train 41 had 39 stations on its route between Lincoln and Alliance, 8 of which were flag stops. Train 44 had 39 stations between Alliance and Lincoln, 2 of which were flag stops. Each such train required one engineer, one fireman, one conductor, one brakeman, and one baggageman and expressman to operate it. Each train was generally powered by a single-unit diesel electric locomotive of 2,000 to 2,250 horsepower. On Sundays each train usually carried three baggage and express cars, and an air-conditioned reclining chair car, having a seating capacity of from 60 to 66 passengers. On other days they also carried a railway post-office car. However, as an economy measure and lack of need caused by closing of post offices on Sundays, the federal government had discontinued such operation of a railway post-office car on Sundays which caused plaintiff a Sunday loss of revenue amounting to an average of $369 in April 1956 and $342 in March 1957.

Detailed revenues received, out-of-pocket expenses, and net losses incurred by the operation of trains 41 and 44 on Sundays were shown by oral evidence and exhibits appearing in the record for each of 39 Sundays in December 1955 to August 1956, inclusive, and for each of 34 Sundays in September 1956 to April 1957, inclusive, from which accurate calculations and just conclusions may be made.

On the 39 Sundays during such first period, despite reasonable efforts to increase patronage, train 41 travel-

ing west, thence northwest toward a sparsely-settled section of the state, averaged only 5.6 passengers per train mile, and train 44 traveling back southeast and east toward the more thickly-populated section of the state averaged only 10.7 passengers per train mile. Also, on the 34 Sundays during such second period, train 41, despite reasonable efforts to increase patronage, averaged only 5.8 passengers per train mile, and train 44 averaged only 11.6 passengers per train mile. In other words, train 41 averaged but little more passengers per train mile than the five employees required to operate the train, and train 44 averaged but little more than twice the number of passengers per train mile than the five employees required to operate it. Further, on each of the first 39 Sundays, plaintiff's expenses for operating the trains were between $102 and $486 more than plaintiff received for the operations, and on each of the second 34 Sundays plaintiff's expenses for operating the trains were between $83 and $630 more than plaintiff received for the operation. The foregoing amply supports the conclusion that Sunday trains 41 and 44 were not only operated at a substantial unwarranted loss, but also that no present need existed for their operation.

Furthermore, plaintiff's faster train 43 is also scheduled to leave Lincoln at 12:15 a. m. and arrive in Alliance at 6:10 a. m., and plaintiff's faster train 42 is scheduled to leave Alliance at 11 p. m. and arrive in Lincoln at 7:05 a. m. Both such trains travel the same route as trains 41 and 44, and operate daily including Sundays. They also each carry sleeping cars, coaches, and headends, and make regular scheduled stops at all principal intermediate towns between Lincoln and Alliance. Also, upon discontinuance of Sunday trains 41 and 44, plaintiff has arranged for conditional or flag stops by trains 42 and 43 to pick up and discharge passengers at Thedford, Dunning, and Anselmo between Broken Bow and Alliance, and at Litchfield between Broken Bow and Ravenna, and to make such stops at

all other stations upon timely notice or flagging whenever trains 42 and 43 have not theretofore been scheduled to stop. Also, Sunday trains 42 and 43 will carry the balance of the express, cream, and mail formerly carried by trains 41 and 44.

In addition, plaintiff's railroad between Lincoln and Alliance is paralleled by an improved, hard-surfaced, modern highway the entire distance, which highway passes through or closely connects with every community on the railroad served by trains 41, 44, 42, and 43, and makes automobile, bus, and truck transportation flexible, speedy, and convenient. In that connection, there is ample convenient Sunday bus service to and from all of plaintiff's intermediate stations between Lincoln and Grand Island and between Grand Island and Broken Bow, and such service is prospectively planned to be given between Broken Bow and Alliance if the patronage justifies it. Thus, if trains 41 and 44 are discontinued, only the following towns between Thedford and Alliance, which have a population as numerically designated, will in any event have no regular Sunday train or bus service, to wit: Hecla, 4; Whitman, 150; Ashby, 175; Bingham, 100; Ellsworth, 11; Lakeside, 75; and Antioch, 30. However, those places each averaged only about one passenger every tenth Sunday, except Whitman which showed a higher average because on December 4, 1955, in the first period aforesaid, 12 passengers boarded train 44 because of a severe snow storm and below freezing temperatures.

The foregoing situation also refutes defendants' contention that there is any public need for Sunday operation of trains 41 and 44. As usual in such cases, the record discloses that a few persons and businesses may be adversely affected in some respects, and that a few persons may suffer some inconvenience by discontinuing Sunday trains 41 and 44, but that is not a controlling factor where, as it appears herein, no public need exists because the public has practically abandoned the use

of such trains. In such cases as that at bar consideration should be given to the public need rather than to individuals.

For reasons heretofore stated, we conclude that the commission did not err in any manner prejudicial to defendants, and that the order of the commission discontinuing Sunday trains 41 and 44 was not unreasonable and arbitrary. Such order should be and hereby is affirmed.

AFFIRMED.